56 CCPA

**AMERICAN CAN COMPANY, Appellant,**

v.

**DIXIE WAX PAPER COMPANY,**
**Appellee.**

**Patent Appeal No. 8063.**

United States Court of Customs
and Patent Appeals.

March 6, 1969.

Kenneth H. Murray, New York City (Nichol M. Sandoe, New York City, of counsel), for appellant.

Ulle C. Linton, William E. Schuyler, Jr., Washington, D. C., for appellee.

Before RICH, Acting Chief Judge, and Judges ALMOND, BALDWIN, and KIRKPATRICK.*

RICH, Judge.

This appeal is from the decision of the Patent Office Trademark Trial and Appeal Board, 150 USPQ 823, insofar as it denied appellant's petition to cancel a registration of appellee [1] and dismissed four oppositions to applications by appellee to register trademarks.[2] Appellee counterclaimed, petitioning to cancel the registrations on which appellant relied but the denial of this petition by the board has not been appealed.

This case represents a kind of "Battle of the Bulge." The litigants, for nearly half a century, have peacefully coexisted in their respective fields of operation, building their separate and non-competing businesses under the name "Dixie" to the point where, as a result of appellant's expanding product line and appellee's more aggressive trademark protectionism, they have become involved in a legal dispute over rights to "Dixie" which it becomes our duty to resolve.

Appellant came on the American scene very early in this century as the Public Cup Vendor Company to exploit the invention of the paper cup. It carried on the battle against the old tin dipper, the public drinking cup, and the office glass. It was ultimately highly successful. Originally selling a "Health Cup," which was a "flop," within a very few years it adopted the catchier name "DIXIE CUP." The first registration of "DIXIE"[3] gives the date of first use as June

---

* Senior District Judge, Eastern District of Pennsylvania, sitting by designation.

1. Reg. No. 730,424, April 24, 1962, claiming first use Dec. 1958.

2. Ser. No. 134,380, Dec. 20, 1961, claiming first use Aug. 1961.
   Ser. No. 134,381, Dec. 20, 1961, claiming first use Oct. 1961.
   Ser. No. 147,901, June 28, 1962, claiming first use May 1958.
   Ser. No. 179,326, Oct. 18, 1963, claiming first use Sept. 1963.

3. Reg. No. 120,264, granted Jan. 29, 1918, renewed to Dixie-Vortex Company, and republished under the 1946 Act by Dixie Cup Company, Nov. 7, 1950. April 9, 1946, Dixie Cup Company obtained registration No. 420,379 for "DIXIE CUP" and design for paper cups and subsequently "Dixie" in various forms of lettering has been registered seven times by appellant and its predecessors for a wide variety of paper products, mostly concerned with food or eating, and food packaging machines, Reg. Nos. 590,464; 595,550; 646,956; 665,019; 707,805; 732,447; and 753,917.

15, 1917, by which time the company name had become Individual Drinking Cup Co., Inc. Subsequent name changes were to Dixie Drinking Cup Company (1922), Dixie-Vortex Company (1936, due to a merger), and simply Dixie Cup Company (1943). In 1957 the company was merged with American Can Company, appellant, and it is now the Dixie Cup Division thereof.

Dixie or Dixieland, whatever the origin of the name—and there appear to be conflicting theories on that subject—is, as the dictionaries show, a name for the region comprising the Southern states of this country. It therefore has a strong geographical connotation. As the name describes a region, it naturally attaches to things in or from that region such as Dixieland jazz and Dixiecrats. As some 90 third party trademark registrations introduced by appellee show, "Dixie" has become a very commonly used trademark or a part of trademarks for a wide variety of goods marketed by others than the parties hereto, many of them located in Dixie.

At the same time, since its first use in 1917, by reason of the sale of untold billions [4] of "Dixie Cups" and some twenty million dollars worth of advertising, the trademarks "DIXIE CUP" and "DIXIE" have achieved a popularity comparable to that of the best known trademarks and even a dictionary status of their own, as witness the following entry in The Random House Dictionary of the English Language (Unabridged Ed., 1967):

> *Dixie Cup* * * * *Trademark.* a disposable paper cup, as for beverages, ice cream, etc.

"Dixie Cups" are found everywhere in dispensers and are sold in stores generally, packaged and prominently displayed for sale to the general public. Even as these words are written they are being advertised on TV for use in the home bathroom, as useful to prevent the spread of coughs due to colds, for removing hot electric light bulbs, for muzzling noisy dogs, and for pouring soap into the washer. They are indeed ubiquitous. The product line has been expanded from paper cups to a wide variety of paper food containers, even including complete disposable table service sets, and plastic disposable knives, forks, and spoons. Almost every American has eaten individual portions of ice cream packaged for sale in "Dixie Cups." There is no doubt that for such wares the marks are well known, favorably regarded, and of great value.

At the same time, there can be no doubt that Dixie is the name of the Southland, the name of the popular song composed by D. D. Emmett in 1859, and is an adjective defined in the above-cited dictionary as meaning "of, from, or characteristic of the southern States of the United States." We are thus presented with a peculiar situation in which a truly famous mark is also a common word and a part of the language. It was, in fact, a common word when appellant's earliest predecessor first adopted it as a trademark for paper cups under the following interesting circumstances as related by the founder of the company:

A. You want the name of the very first trademark we used?

Q33. Yes sir. A. It was Health Cup. * * *—which was a flop.

Q34. How long did you use it, sir? A. According to my recollection, probably two or three years.

Q35. Did you then substitute another mark for it? A. Yes: Dixie Cups.

&ast; &ast; &ast; &ast; &ast; &ast;

Q88. Mr. Moore, I failed to ask you earlier how it was that you selected "Dixie" as a trademark for your products. A. Well, as I have said, the word "Health Cups" didn't go over, and it happened that in this loft building at 220 West 19th Street we had a neighbor who was making Dixie Dolls, and I knew by this time something

---

4. Appellant's brief estimates 75 billion units in the ten years ending in 1962, over ten billion having been sold in 1962. Total dollar sales in the ten-year period were approximately $600,000,000 with sales of $85,000,000 in 1962.

about manufacturing. This man who owned the Dixie Doll factory was an advertising man. I used to help him on his manufacturing problems.

One night we were at dinner, and I said, "Al"—his name was Al Schindler —"what would you think of us calling our product Dixie Cups?" "Oh," he said, "that would be great, the name flips off the tongue well, it is memorable," and so we changed to Dixie Cups and thereby established what has become one of the best known trademarks in America.

A mark thus selected, one already in use by another, consisting of a common word descriptive of a region, has its obvious limitations, notwithstanding its acquisition of a "secondary meaning" even to the extent of being famous as a mark for *particular* goods. When Mr. Moore, whose testimony was just quoted, was asked on cross examination whether his companies had used the word "DIXIE" or "DIXIE CUP" the most, he replied, " 'Dixie Cup' * * * Because we knew that 'Dixie' was used for other purposes; Dixie, Down South in Dixie, and so forth."

We now turn to consider the history and development of appellee's use of "DIXIE." The Dixie Wax Paper Company was incorporated under that name in Texas in 1922. Texas, we presume, is in Dixie. Its business is essentially that of a paper converter selling to industry. It buys paper from others, producing therefrom waxed and otherwise coated or treated paper printed to its customers' specifications. It does not sell to the general public or to stores or through jobbers, brokers, or wholesalers. It sells its products through its own salesmen from plants in Dallas, Texas; Memphis, Tennessee; and Burlingame, California. It has a subsidiary in Mexico City and at one time had a plant in Washington, New Jersey. Its customers are food producers and packagers, mostly in the snack field—potato chips, corn chips, peanuts, cookies, etc. It also sells to bakers of bread and pies, and to candy and ice cream manufacturers. What it sells primarily is printed webs of waxed or coated or glassine paper which the customer uses on automatic packaging machines. Such webs are sold in rolls which range from 11″ to 21¾″ in width and to 12½″ in diameter. They weigh from 50 to 100 pounds. It also sells some printed sheets and some manufactured bags to similar customers. It advertises in trade publications, not to the general public. At least since the early thirties, its name, Dixie Wax Paper Company, has been placed on its products and its customers have come to know the company well by the name "Dixie." In the minds of those customers, and potential customers who read the trade papers carrying appellee's advertising, the marks which are the subject of the registration and applications here involved are associated with Dixie Wax Paper Company. Purchasers of appellee's products buy them as a result of advertising directed to the food packaging trade, salesmen's representations, and price lists. The goods are then produced to order by printing the customer's designs and trademarks on them. Appellee's trademarks placed on such goods serve only to identify them after purchase and as type differentiation, but do not function as a selling aid.

The following are the specific marks involved on this appeal. First is the mark on which appellee already has a registration which appellant seeks to cancel:

Reg. No. 730,724

The goods named in the registration are "CONTINUOUS WEBS OF PRINTED WAXED PAPER FOR USE BY CONSUMERS IN FORMING BAGS FOR PACKAGING FOODS." The consumers, of course, are industrial organizations equipped with packaging machinery by which they can form and fill bags, not "consumers" in the usual sense who are going to wrap their children's school lunches.

The marks described in the four applications being opposed are:

Ser. No. 134,380

Ser. No. 134,381

Ser. No. 179,326

Ser. No. 147,901

In each of these applications the identical description of goods appears: "CONTINUOUS WEBS OF PRINTED WAXED PAPER." It will be seen that all five marks have in common the combination of a lower case "d" on a dark background coupled somehow with the word "DIXIE," Ser. No. 147,901 consisting only of this, the other marks adding the designations "Auto-Pac," "Dixie Rap," "-PAC 77," and "-PAC 99." Appellee uses signs on its factories and trailer truck bodies resembling the "d-DIXIE" logotype which characterizes all of the above marks. The same logotype is used on its office stationery.

The board, to whose published opinion we refer for greater detail, in summary, concluded that on the facts of this case there is not such likelihood of confusion, mistake, or deception as to warrant sustaining the oppositions or cancelling appellee's registration. In doing so it referred to the extensive evidence of use of "DIXIE" marks by others including not only numerous third-party registrations but pages from Thomas Register and appellee's concrete evidence, which we have examined, of actual uses of "DIXIE" on paper products. It also relied on the differences in the marks, differences in the goods, and considered appellant's alleged instances of actual confusion.

In this court appellant raises most if not all of the same issues which it presented to the board. It has filed an unusually long and detailed brief and a reply brief which we have carefully considered together with the voluminous exhibits and testimony. Its 32-page argument is presented under the following five headings, on each of which we will comment briefly.

"A. There is no evidence of trademark use by appellee of the word 'DIXIE' or any combination thereof prior to 1955."

The board made the contrary finding that appellee had used marks comprising the term "DIXIE" since about 1932 and we find substantial evidence in the record to sustain that finding. Moreover, we do not consider it necessary for appellee to have proved a *technical* trademark use of such old marks as "DIXIE STAR" and "DIXIE-LITE." We are not here concerned with the registrability of those marks. Nor are we concerned with priority. The use of those names from an early date in connection with the sale of appellee's products was relied on by the board as a basis for saying, in effect, that experience shows that confusion is unlikely because confusion did not occur despite the aforesaid uses.

"B. There is substantial identity between the marks of the respective parties."

We do not agree. Inspection shows otherwise.

"C. There is substantial identity between the products of the respective parties."

We do not agree. Appellant here attempts to confuse appellee's actual

customers with those customers' customers who buy the bagged potato chips, peanuts, etc. We take particular note of the necessarily inherent inconspicuousness of appellee's trademarks on the potato chip bag or the like when it reaches the supermarket where, as appellant argues, it may be right alongside some "Dixie Cups." Appellee, though it places its trademarks on each bag element as it prints its continuous web for its customer, necessarily has to make it quite inconspicuous. The record clearly shows this. The appellee's customer is selling his potato chips or other food product and his own name or mark is what the buyer is going to see, not appellee's mark. The bag printer's mark is relegated to a location where it does not show and is printed in small type, like the union label on a garment or a book (as may be seen, for example, on the back of the title page of any volume of USPQ since Vol. 51).

"D. There is substantial evidence of actual confusion."

We do not agree that it is substantial. The situation here is that not only appellant and appellee but many others are legitimately doing business under "Dixie" marks and a certain amount of actual confusion must be expected and tolerated, as one cannot expect to have the benefit of a telephone without the bother of an occasional wrong number. Considering the long period of concurrent operations of the parties under "Dixie" marks and trade names, such minor concrete episodes as appellant has produced amount practically to nothing and appellant's more general assertions of confusion are not shown to be attributable to use of the marks here involved, rather than to appellee's trade name.

"E. The third party registrations and third party uses cited by appellee fail to show that appellant's mark is not distinctive."

We do not say appellant's mark is not distinctive, nor did the board. We have pointed out, however, that since it is a part of the language its distinctiveness as a mark has certain definite limitations with respect to products.

To conclude, we fail to find any sufficient showing in appellant's arguments of reversible error in the board's decision and it is therefore affirmed.

Affirmed.

KIRKPATRICK, J., took no part in the decision of this case.