**UNION NATIONAL BANK OF TEXAS, LAREDO, TEXAS, Plaintiff–Appellant,**

v.

**UNION NATIONAL BANK OF TEXAS, AUSTIN, TEXAS, Defendant–Appellee.**

No. 89–1885.

United States Court of Appeals, Fifth Circuit.

Aug. 28, 1990.

Horace C. Hall, III, Hall, Quintanilla, Palacios & Alarcon, Laredo, Tex., John R. Feather, Vaden, Eickenroht, Thompson & Boulware, Houston, Tex., for plaintiff-appellant.

Kenneth R. Wynne, Bracewell & Patterson, Houston, Tex., for defendant-appellee.

Before GOLDBERG, REAVLEY and HIGGINBOTHAM, Circuit Judges.

GOLDBERG, Circuit Judge:

What is in a name? Shakespeare wrote that a rose by any other name would smell as sweet,[1] but that sentiment is not shared

---

1. Romeo and Juliet, Act II, scene *ii*, 43.

by the parties to this dispute. Union National Bank of Texas, Laredo, Texas ("UNB–Laredo") seeks to prevent Union National Bank, Austin, Texas ("UNB–Austin") from using the names "Union National Bank" or "Union National Bank of Texas" and appeals the district court's denial of its request for a permanent injunction. The issue, as presented by the parties, is whether the combination of words "Union National Bank" or "Union National Bank of Texas" are entitled to trademark protection.[2]

█ The district court ruled as a matter of law that the names "Union National Bank" and "Union National Bank of Texas" are descriptive and therefore not protected under trademark law absent proof of "secondary meaning."[3] We find the trial court applied the incorrect legal standard and therefore REVERSE and REMAND.

## FACTS AND PROCEEDINGS BELOW

UNB–Laredo is a national banking association with its principal place of business in Laredo Texas and a branch office in San Antonio. It was originally named "United National Bank of Laredo," but in December, 1987 changed its name to "Union National Bank of Texas." The name change appears to have been motivated by a desire for a less regional name which would facilitate expansion, because in 1988 UNB–Laredo opened a branch in San Antonio.

UNB–Austin is also a national banking association. It is a subsidiary of Union of Arkansas Corporation. Union of Arkansas is a holding company which owns a number of banks in Arkansas and Oklahoma, all of which are called "Union National Bank of _____," with the appropriate geographical designation. It appears from the record that UNB–Austin has been using the "Union National Bank" name for many years prior to the establishment of UNB–Laredo—but not in Texas. UNB–Austin's presence in Texas came about as a result of its successful bid on the assets of a failed Texas institution in a sale organized by the Federal Deposit Insurance Corporation in August, 1988.[4] After UNB–Austin opened for business it received notice from UNB–Laredo that the Laredo institution laid claim to the name. UNB–Laredo subsequently filed suit to attempt to force UNB–Austin to change its name. In response, UNB–Austin changed its name from "Union National Bank of Texas, Austin, Texas" to "Union National Bank, Austin, Texas." UNB–Laredo is dissatisfied with this modification and seeks to enjoin UNB–Austin's use of either "Union National Bank" or "Union National Bank of Texas." UNB–Laredo claims that UNB–Austin's name is deceptively similar to UNB–Laredo's name and its use therefore violates Sec. 43 of the

2. For purposes of this opinion the term "trademark" includes trade names and service marks. Since banks are in the business of providing services, the terms at issue in this case are more appropriately designated "service marks." These terms are also used as "trade names," or the names under which both parties do business. There are differences between each classification with respect to registrability, etc. under the Lanham Act, but the terms are often used interchangeably and such differences as do exist are not relevant to our decision in this case. *See Blinded Vet. Ass'n v. Blinded Am. Vet. Foundation*, 872 F.2d 1035, 1040, n. 11 (D.C.Cir. 1989) ("[W]e denote as a 'trademark' the name of a product, service *or* business enterprise that may be appropriated to the use of one party under the common law or the Lanham Act.") (emphasis in original).

3. "Secondary meaning" is a term of art in trademark law. It refers to the situation which arises when a company has a mark which might ordinarily be ineligible for protection were it not for the fact that the name has come to be closely associated, (in a distinct market), with a particular manufacturer's product or service.

4. It is worth noting that the deregulation of the banking industry and the advent of branch banking, in conjunction with the current banking crisis, may have led to this problem of competing banks with the same name. Union of Arkansas had been discussing with the FDIC since 1987 the possibility of acquiring a failed Texas institution to facilitate its expansion into the Texas market. We have no evidence before us that either the Comptroller or the FDIC gives any thought to the issue of names in the context of the approval of applications for new banks, or sale of the assets of failed banks. Perhaps they should.

Lanham Act, 15 U.S.C. § 1051 *et seq.*, and the common law of unfair competition.

The case was heard without a jury in the United States Court for the Western District of Texas. After UNB–Laredo had presented its first witness, the district court, at the urging of counsel for UNB–Austin, called a halt to the presentation of evidence in order to hear legal arguments on the issue of whether or not the terms UNB–Laredo laid claim to were descriptive. After hearing arguments the court ruled that as a matter of law the name "Union National Bank" was descriptive and thus required proof of secondary meaning before it could be afforded trademark protection. Since UNB–Laredo had stipulated that it could not prove secondary meaning in the Austin market, the district court reasoned, there was nothing left to try because UNB–Laredo was not entitled to relief.[5] It therefore denied UNB–Laredo's request for a permanent injunction. UNB–Laredo appeals this ruling.

### DISCUSSION

The threshold question in this case is whether the names "Union National Bank" and "Union National Bank of Texas" are eligible for protection under either the Lanham Act or the common law of unfair competition.[6] Trademark law, as the trial court observed, often presents issues that are "more gray than black and white."[7] The question of when a trade name is eligible for protection leads courts into the surgical parsing of phrases, and questions of grammar and semantics that defy easy categorization, as the subject matter is that most dynamic of creations—language. Complicating an already complicated inquiry in this case is the distinction between an issue of fact and an issue of law. The district court made its ruling on the appropriate categorization of the name "Union National Bank" as *a matter of law.* This was an error. However, to understand why we must examine some of the basic principles of trademark law.

### I. Trademarks

#### A. Background

Ownership of trademarks is established by use, not by registration.[8] The first one to use a mark is generally held to be the "senior" user and is entitled to enjoin other "junior" users from using the

---

5. UNB–Laredo stipulated that it could not prove secondary meaning in the Austin market but argued that the Austin market was within its "natural zone of expansion." Based on this premise, UNB–Laredo reasoned that its mark would be entitled to protection in Austin if it could prove secondary meaning elsewhere. This issue raises complicated questions of fact and law which, because of our holding in this case, we do not address here. We believe it is better left to the trial court to decide these issues after hearing all the evidence.

6. The standards for determining whether a trade or service mark is eligible for protection are essentially the same under the common law and the Lanham Act. The only difference is that registered marks which have become "incontestable" under the Lanham Act and its subsequent amendments, *see* 15 U.S.C. § 1065 and 15 U.S.C. § 1115(b), are protected from challenge by a presumption of validity. *See Park 'N Fly v. Dollar Park 'N Fly,* 469 U.S. 189, 105 S.Ct. 658, 664 n. 5, 83 L.Ed.2d 582 (1985).

This difference does not apply in the instant case. UNB–Laredo has not registered its mark, and while UNB–Austin has, that registration is still subject to geographical limitations under the case law. *See Dawn Donut Co. v. Hart's*

*Food Stores, Inc.,* 267 F.2d 358 (2d Cir.1959) (owner of federally registered mark only entitled to injunctive relief in the market it actually serves plus its "natural zone of expansion"). For a discussion of the view that this is an appropriate, but perhaps erroneous, judicial interpretation of Congressional intent in the passage of the Lanham Act see Carter, *The Trouble with Trademark,* 99 Yale L.J. 759, 790–795 (1990) [hereinafter Carter]. "[N]othing in the Lanham Act carves out such an exception from the nationwide right to use the mark." *Id.* at 791.

7. Tr.Trans., p. 102, Record on Appeal, Vol. 5.

8. Even the owners of registered trademarks cannot enjoin the use of their mark by others unless they can show that they actually are using the mark. This situation may have been changed by recent amendments to the Lanham Act embodied in the Trademark Law Revision Act of 1988, Pub.L. No. 100–667, 102 Stat. 3935, as codified in 15 U.S.C. §§ 1051–1127 (1988). For an argument that these amendments encourage or permit "warehousing" of trademarks, a practice which is contrary to the policies underlying trademark protection, see Carter, *supra* note 6 at 778–781.

mark, or one that is deceptively similar to it, subject to limits imposed by the senior user's market and natural area of expansion.[9] While trademarks have some aspects of property, i.e. the right to exclude others, they are not viewed solely as property. Thus, the right to exclude others is limited in various ways. A senior user lude others in areas where he does not currently do business nor is likely to do business in the future. *Dawn Donut Co. v. Hart's Food Stores, Inc.*, 267 F.2d 358, 364–65 (2d Cir.1959) (owner of viable mark not able to enjoin its use by others in area where owner not likely to expand). He may not enjoin others from using the mark if he has ceased to use it. *Exxon Corp. v. Humble Oil Exploration Co.*, 695 F.2d 96, 101 (5th Cir.1983) (Lanham Act does not allow protection of a mark solely to prevent others from using it; mark must be used in commerce). He may not enjoin others from using the mark if the likelihood of confusion between his product and the infring-

er's is minimal or non-existent, such as where the parties to the action use the mark in totally different markets, or for different products. *See Amstar Corp. v. Domino's Pizza*, 615 F.2d 252 (5th Cir. 1980) (no likelihood of confusion between pizza delivery service's use of the mark "Domino" and that of a company selling sugar principally in grocery stores). *See also Sun Banks of Fla. v. Sun Fed. Sav. & Loan*, 651 F.2d 311 (5th Cir.1981) (no likelihood of confusion between parties' use of the word "sun" in their names where logos dissimilar, where there was evidence of extensive third-party use of word "sun," and little evidence of actual confusion).

B. Purpose of trademark protection

These limitations are manifestations of the two principal concerns of trademark law, both of which are seen as promoting competition:[10] (1) to protect consumers against confusion and monopoly, and (2) to protect the investment[11] of producers in

9. "Zone of expansion" doctrine represents a conundrum within the conundrum of trademark law. It is an area which will not be explored in depth here but which is relevant to this case on remand. A senior user may enjoin a junior user in the senior user's "natural zone of expansion." *See e.g. Hanover Star Milling Co. v. Metcalf*, 240 U.S. 403, 36 S.Ct. 357, 60 L.Ed. 713 (1915); *John R. Thompson Co. v. Holloway*, 366 F.2d 108 (5th Cir.1966); *American Foods, Inc. v. Golden Flake, Inc.*, 312 F.2d 619 (5th Cir.1963). But before a court may examine what is a user's "natural zone of expansion," it must first ask, "Who is the 'senior user'?" That in turn asks the question, "What is the 'market' for purposes of determining who is the 'senior user'?" This of course begs the original question and quickly leads to a rather circular inquiry. To define the "market," for purposes of deciding who is the senior user, would seem to require including a company's "natural zone of expansion." Otherwise, the definition would merely be arbitrary and not based on facts. For example, UNB–Austin is the senior user if we define the market as being the nation, or even the South or Southwest. On the other hand, if we define the "market" as limited by state boundaries, then UNB–Austin is the senior user in Oklahoma and Arkansas, but UNB–Laredo is the senior user in Texas. But there is no particular reason to define "the market" on the basis of national or state boundaries if it does not conform to the commercial reality. One would expect the "natural zone of expansion" for a large company to be different than that for a small company. (Although, in cases such as the one at bar, this fact may work to

effectively guarantee that small users will lose, even when they are senior.) Similarly, Texas might be part of the "natural zone of expansion" for a company located in Arkansas and Oklahoma. But then it is also conceivable that anywhere in Texas is part of the normal zone of expansion for a Texas bank. There is no clear, principled way of resolving this problem. It is a question of trademark law which cries out for legislative clarification, particularly in light of the advent of branch banking which redefined bank markets.

10. "[T]rademarks foster competition and the maintenance of quality by securing to the producer the benefits of a good reputation." *Park 'N Fly, Inc. v. Dollar Park 'N Fly*, 469 U.S. 189, 198, 105 S.Ct. 658, 663, 83 L.Ed.2d 582 (1985). This may be why trademark law is considered part of the law of unfair competition. "Unfair competition [is] the broad class of business torts of which trademark infringement is one species." *Keebler Co. v. Rovira Biscuit Corp.*, 624 F.2d 366, 372 (1st Cir.1980). *See also United Drug v. Rectanus Co.*, 248 U.S. 90, 97, 39 S.Ct. 48, 50–51, 63 L.Ed. 141 (1918) (Trademark infringement cases are a part of broader law of unfair competition).

11. The financial investment in trademarks is often substantial. Millions of dollars are routinely spent by the corporate giants on the search for and promotion of that magic word or words that will move a product off the shelf, or bring in customers in droves. And the more

their trade names to which goodwill may have accrued and which goodwill free-riders may attempt to appropriate by using the first producer's mark, or one that is deceptively similar.

"Common-law trademarks, and the right to their exclusive use, are, of course, to be classed among property rights, *but only in the sense that a man's right to the continued enjoyment of his trade reputation and the goodwill that flows from it, free from the unwarranted interference by others, is a property right,* for the protection of which a trademark is an instrumentality."

*Hanover Star Milling Co. v. Metcalf,* 240 U.S. 403, 413, 36 S.Ct. 357, 360, 60 L.Ed. 713 (1915) (emphasis added).

Thus, "the gravamen for any action of trademark infringement or common law unfair competition is whether the challenged mark is likely to cause confusion." *Marathon Mfg. Co. v. Enerlite Prod. Co.,* 767 F.2d 214, 217 (5th Cir.1985). The idea is that trademarks are "distinguishing" features which lower consumer search costs and encourage higher quality production by discouraging free-riders.[12]

From these policies and concerns stem the various doctrines which control trademark law. The doctrines represent imperfect attempts to grasp that which is inherently slippery—what is in a name? Their purpose is to provide a basis for analyzing trademarks with a view towards achieving the ends visualized by the laws.

## II. Mechanics

### A. In General

▪ A party seeking an injunction for trademark infringement must clear several hurdles in order to prevail. First, he must prove that the name he seeks to protect is eligible for protection. He must then prove he is the senior user. Having proven these elements he must then show a likelihood of confusion between his mark and that of the defendant. Finally, because he is asking for the equitable remedy of an injunction, he must show that the likelihood of confusion will actually cause him irreparable injury for which there is no adequate legal remedy. It is the first of these requirements which concerns us now.

### B. Classification of Marks

▪ "The threshold issue in any action for trademark infringement is whether the word or phrase is initially registerable or protectable." *Zatarains, Inc. v. Oak Grove Smokehouse, Inc.,* 698 F.2d 786, 790 (5th Cir.1983). *See also Bank of Texas v. Commerce Southwest, Inc.,* 741 F.2d 785, 786 (5th Cir.1984); *Vision Center v. Opticks, Inc.,* 596 F.2d 111, 115 (5th Cir.1980). To determine whether a word or phrase is protectable, it must first be determined into which category, (1) generic, (2) descriptive, (3) suggestive, or (4) arbitrary or fanciful, the word or phrase belongs. *Abercrombie & Fitch, Co. v. Hunting World, Inc.,* 537 F.2d 4, 9 (2d Cir.1976); *Soweco, Inc. v. Shell Oil Co.,* 617 F.2d 1178, 1183 (5th Cir.1980); *Zatarains, supra,* at 790; *Vision Center, supra,* at 115.

▪ The significance of assigning a word or phrase to one of these categories is that the assignment determines whether or not, or in what circumstances, the word or phrase is eligible for trademark protection. Generic terms are *never* eligible for trademark protection. Descriptive terms may only be protected after proof of secondary meaning, and suggestive, arbitrary or fanciful terms are all protectable without proof of secondary meaning. *See e.g., Za-*

---

indistinguishable competing products are, the fiercer the competition over, and protection of, the name. No doubt, for some corporations in this status-conscious era, their names are their most precious asset as long as the mere affixing of the name on a label guarantees millions in profits. One may certainly question whether or not such investments are socially desireable or are "productive," but the received wisdom is that they are and are thus entitled to some protection. In addition, from a practical standpoint, a name change requires a substantial investment because it requires every single document bearing the old name to be exchanged for ones bearing the new name, new signs, new packaging, advertising of new names, etc.

12. *See* Landes & Posner, *Trademark Law: An Economic Perspective,* 30 J.L. & Econ. 265, 268–70 (1987).

*tarains, supra,* at 790–91. Because legal consequences attach to the assignment of a word or phrase to one of these categories, thus we must examine what the law says about each category.[13]

## C. Definitions

█ A generic term is one which identifies a genus or class of things or services, of which the particular item in question is merely a member. *Zatarains, supra,* at 790. An example of a generic word is "fish." "Fish" is a generic term which applies with equal force to sole, haddock, perch, salmon, bass and carp.

█ A descriptive term is one that "identifies a characteristic or quality of the article or service." *Vision Center,* 596 F.2d at 115. Thus, in many cases, a descriptive term will be an adjective such as "speedy," "friendly," "green," "menthol," or "reliable." *But see Convenient Food Mart v. 6–Twelve Convenient Mart,* 690 F.Supp. 1457, 1462–64 (D.Md.1988) (Noun/adjective test not helpful; "convenient," in context of convenience stores, is generic describing class of which plaintiff was merely a member). Geographical terms such as "Texas," "Midwest," "Madison Avenue," or "Philadelphia" are also considered descriptive terms when they describe where the products or services are offered or manufactured. *Bank of Texas,* 741 F.2d at 787.[14]

█ A suggestive term is one which "suggests rather than describes, some particular characteristic of the goods or services to which it applies and requires the consumer to exercise the imagination in order to draw a conclusion as to the nature of goods and services." *Zatarains,* 698 F.2d at 791. An oft-cited example of a suggestive term is "Penguin" as applied to refrigerators. *See e.g., Soweco,* 617 at 1184; *Sun Banks of Fla. v. Sun Fed. Sav. & Loan,* 651 F.2d 311, 315 (5th Cir.1981) (citing *Soweco, supra). See also* opinion of district court, Record Excerpts p. 14, citing *Sun Banks, supra.*

█ Finally, arbitrary and fanciful terms or phrases are those which are either coined words or words which are not suggestive of the product or service. Here we have a sub-set of classifications within the categories. Fanciful terms are most often coined words such as "Xerox" or "Kodak." *See, Zatarains,* 698 F.2d at 791, citing *Eastman Kodak Co. v. Weil,* 137 Misc. 506, 243 N.Y.S. 319 (1930).[15] By contrast, the term "arbitrary" refers to ordinary words which do not suggest or describe the services involved. An example is "Ivory" as applied to soap. *Zatarains, supra,* at 791, (citing *Abercrombie & Fitch,* 537 F.2d at 9 n. 6.)[16]

---

**13.** The significance of this assignment cannot be over-emphasized since, as in this case, once a determination has been made, it *may* bring a party's case to a halt, precluding the presentation of other evidence. We do not think that the trademark law is so clear that the interests it is meant to protect will be served in most cases without a thorough presentation of the evidence on *all* of the issues. Therefore, it will be the exceptional case which may be disposed of on these grounds. Since, as we observed above, the likelihood of confusion is the essential concern in trademark law, no purpose is served, unless the mark is found to be generic, by eliminating a case on this ground if in fact consumers are likely to be confused.

**14.** *But see Artcraft Novelties v. Baxter Lane Co. of Amarillo,* 685 F.2d 988 (5th Cir.1982) ("Texas" suggestive with respect to use on out-sized, "Texas-brag" novelty items).

**15.** Alas, even fanciful, coined terms may be rendered generic by use, subjecting their owners to the cancellation of the registration and protection of their trademark. Witness the struggle of the owners of the "Xerox" trademark to discourage the use of the term as a verb or a noun in place of "photocopy." An example of some formerly fanciful terms relegated to the trademark graveyard of genericism are "thermos," "trampoline," "aspirin," "yo-yo," and, surprisingly, "Singer" (for sewing machines). For a listing of the cases of these and other former trademarks held generic, see L. Altman, Callmann Unfair Competition, Trademarks and Monopolies, § 18.25, 4th ed., vol. 3 (Callaghan 1990). For an excellent discussion of the problems with the determination of "generic-ness" and suggested guidelines see Folsom & Teply, *Trademarked Generic Words,* 89 Yale L.J. 1323 (1980).

**16.** In *Abercrombie & Fitch* Judge Friendly went on to write:

As terms of art, the distinctions between suggestive terms and fanciful or arbitrary terms may seem needlessly artificial. Of course, a common word may be used in a fanciful

## III. Application

### A. Standard of review

█ "The correct categorization of a given term is a factual issue...." *Zatarains*, at 793. *See also Soweco*, at 1183 n. 12. Nevertheless, it has many attributes of a question of law and courts, as the district court in this case, often list it among their findings of law. *See e.g., King–Size, Inc. v. Frank's King Size Clothes, Inc.*, 547 F.Supp. 1138, 1155–56 (S.D.Tex.1982); *Dominion Bankshares Corp. v. Devon Holding Co.*, 690 F.Supp. 338 (E.D.Pa.1988). As we noted in *Security Centers*, "The question of law is so constantly mixed up with the various questions of fact ... that it is sometimes difficult when examining former decisions to disentangle what is decided as fact and what is laid down as a principle of law." 750 F.2d at 1297–98 n. 3, (quoting *Reddaway v. Banham*, 1896 A.C. 199, 204 (H.L.)). In spite of this very understandable confusion, the categorization of a term is properly considered a matter of fact because the appropriate categorization is not self-evident.

### B. Application of the Categories to a Particular Trademark

"Although meant as pigeon-holes, these useful labels are instead central tones in a spectrum; they tend to merge at their edges and are frequently difficult to apply." *Soweco*, 617 F.2d at 1183. Words are often ambiguous. As our colleague Judge Thornberry wrote in *American Heritage, supra,* "[W]e are ... mindful of the Socratic admonition that words are more plastic than wax." *American Heritage,* 494 F.2d at 11. The English language, more than most, is in a constant state of

flux. A word which is today fanciful may tomorrow become descriptive or generic. *See Security Center, Ltd. v. First Nat'l Sec. Centers,* 750 F.2d 1295, 1298 n. 4 (5th Cir.1985). *See also Convenient Food Mart,* 690 F.Supp. at 1462–63 (noun-adjectives are "recent linguistic corruptions" but firmly established in the language); *Continental Motors Corp. v. Continental Aviation,* 375 F.2d 857, 862 (5th Cir.1967) (no longer may say with finality that geographic terms cannot acquire protected status). Thus, the trier of fact must be aware of, or informed of, common, up-to-date usage of the word or phrase.

Furthermore, even were usage not constantly changing, the context in which a word or phrase appears is relevant to determining the proper category for purposes of trademark protection eligibility. The word or phrase must be compared to the product or service to which it is applied. "[W]ords are chameleons which reflect the color of their environment." *American Heritage,* 494 F.2d at 11 (paraphrasing Judge Learned Hand in *C.I.R. v. National Carbide Corp.,* 167 F.2d 304, 306 (2d Cir. 1948)). For example, the word "fish," previously discussed, was said to be generic as it describes a category of aquatic life. Yet "fish" as used in "fish market" turns "fish" into a descriptive term if it describes a type of "market." [17] Used in the phrase "FishWear" for dive clothing, "fish" may be suggestive if the intent is to suggest that divers who wear this clothing will be able to "swim like a fish." On the other hand, with respect to clothing worn *while* fishing, "FishWear" might be descriptive. Finally, "fish," used in the name of a product totally unrelated to anything having to do with fish, or suggestive thereof, such as

---

sense; indeed one might say that only a common word can be so used, since a coined term cannot be first put to a bizarre use. Nevertheless, the term "fanciful," as a classifying concept, is usually applied to words invented solely for their use as trademarks. *When the same legal consequences attach to a common word, i.e., when it is applied in an unfamiliar way, the use is called "arbitrary."* *Abercrombie & Fitch,* 537 F.2d at 11 n. 12 (emphasis added).

In its brief and at oral argument, UNB–Austin conflates the categories of fanciful and arbitrary. (Appellee's Brief, p. 13). Since UNB–Laredo argues that "Union" is arbitrary, citations to fanciful terms such as "Kodak" to refute this proposition are inapposite.

**17.** This is assuming of course that it is applied to a fish market. The same name applied to a restaurant for instance is a more difficult problem.

"Fish National Bank," would appear to be arbitrary.[18]

The context in which a particular word or phrase is used is examined, not just with respect to how it is used with other words or the products or services to which it is applied, but also to the *audience* to which the relevant product or service is directed. To paraphrase Judge Learned Hand, the question is, "What do the buyers understand by the word for whose use the parties are contending?" *Bayer Co. v. United Drug Co.*, 272 F. 505, 509 (2nd Cir.1921). Thus, while for the general public the word "roots" may only call to mind tuberous plant growths which extend below the surface of the earth, for *some* consumers it is apparently a generic term for vacuum pumps. *See Dresser Indus., Inc. v. Heraeus Engelhard Vacuum, Inc.*, 267 F.Supp. 963, 969–70 (W.D.Pa.1967), *aff'd*, 395 F.2d 457 (3rd Cir.), *cert. denied*, 393 U.S. 934, 89 S.Ct. 293, 21 L.Ed.2d 270 (1968).

■ While at times the appropriate categorization may seem self-evident, and therefore unnecessary of clarification

through the presentation of evidence, a review of the cases should dispel that notion.[19] We should be wary of leaping too quickly to any conclusion before a full presentation of the evidence. A starting place is the dictionary definition. Although, while evidence of the dictionary definition is "appropriate and relevant evidence", *American Heritage Life Ins. Co. v. Heritage Life Ins. Co.*, 494 F.2d 3, 11 n. 5 (5th Cir.1974), it is not dispositive. *Security Center, Ltd. v. First Nat'l Sec. Centers*, 750 F.2d 1295, 1298 n. 4 (5th Cir.1985) ("Dictionaries lag behind linguistic realities, ... so the dictionary test may be of questionable validity in many instances."); *Liquid Control Corp. v. Liquid Control Corp.*, 802 F.2d 934, 938 (7th Cir.1986) (many terms found generic despite their absence from dictionary). *See generally Vision Center, supra*, at 116 (using dictionary definition); *Zatarains, supra*, at 792 (dictionary a "suitable starting place").

Another source of evidence is a consumer survey, although one must be careful to properly structure the survey.[20] *See e.g., Zatarains*, 698 F.2d at 795–796.[21] A third method for determining the appropriate

---

**18.** This example demonstrates that even within the category of arbitrary terms, some words are "better" than others, perhaps because they are evocative of characteristics or images appropriate to the business. Much of trademark law seems predicated on the assumption that there is an infinite universe of acceptable words for businesses to choose for their names, but that *descriptive or generic terms are "better"* because they communicate more information to the consumer thus lowering consumer search costs. The rationale for denying protection to generic words or limiting it in the case of descriptive words, is that to give the holder of a generic or highly descriptive mark would bestow on it an effective monopoly on the use of a term common to all in the industry and that this would represent unfair competition. On the other hand, this rationale seems to create an incentive for choosing an arbitrary or fanciful mark, since they are more likely to be eligible for protection. However, an incentive to choose an arbitrary or fanciful mark cuts against the law's concern for accurate communication to the consumer, since by definition arbitrary or fanciful terms by themselves carry *no* information about the product or service. In fact, the assumption that generic or descriptive marks are "better" is not always valid. Sometimes marks are desireable merely because they are "catchy." *See American Can Co. v. Dixie Wax Paper Co.*, 407 F.2d 420 (C.C.P.A.1969) (descriptive term

"Health Cup" for disposable paper cups was a "flop"; same product, marketed under the tradename "Dixie Cup," chosen because it was "catchy," phenomenal success). For a discussion of the problem with the assumption of the "irrelevant mark," see Carter, *supra* at note 6, *passim.*

**19.** A review of the cases inevitably reveals a decision which seems inexplicable. A particularly good source to review the decisions made in other cases is, the excellent and exhaustive opinion of Judge Bue in *King–Size, Inc. v. Frank's King–Size Clothes, Inc.*, 547 F.Supp. 1138 (S.D.Tex.1982). In it Judge Bue provides lists of several examples of words in each category which were culled from other decisions. *Id.* at pp. 1151–54, nn. 6, 8 & 11–13. Among the more surprising examples Judge Bue lists is "Hill–Billy" as generic for soft drinks.

**20.** For a discussion of the dangers of an improperly constructed survey, see Zeisel, *The Surveys that Broke Monopoly,* 50 U.Chi.L.Rev. 896 (1983).

**21.** In *Zatarains* the surveys were used in connection with the likelihood of confusion issue. The likelihood of confusion and categorization issues often overlap. Likelihood of confusion is also a factual question. *See Roto–Rooter Corp.*

category is the so-called "imagination test" which asks the trier of fact, be it judge or jury, to "measure the relationship between the actual words of the mark and the product [or service] to which they are applied." *Zatarains, supra,* at 792. If a word requires imagination to apply it to the product or service in question, it tends to show that the term as used is suggestive. On the other hand, if the word conveys information about the product, it is descriptive. *Id.*

Another line of inquiry is whether others in the same business would generally need the word to adequately describe their product or service.[22] Expert testimony of scholars of language and usage may be helpful. Finally[23], parties may introduce evidence regarding how many other businesses, *in the same industry*[24], use the term to describe their product. *Zatarains, supra,* at 793; *Vision Center,* 596 F.2d at

117. *See also American Heritage Life Ins. Co. v. Heritage Life Ins. Co.,* 494 F.2d 3, 11 (5th Cir.1974) ("heritage" commonly used in insurance company names nationwide).[25]

■■■ The district court, after hearing arguments on the issue, found as a matter of law that the phrases "Union National Bank" and "Union National Bank of Texas" were descriptive only, thus requiring proof of secondary meaning. However, legal arguments and comparison to the decisions in other cases is not helpful without reference to evidence of the context in which the word or phrase is used. The court did not include in its findings of fact any facts which support or explain its conclusion. Although in *Security Centers* we suggested that treating the evidence as matters of fact and the ultimate conclusion as a matter of law might be a "more workable paradigm," in this case, that analysis

v. *O'Neal,* 513 F.2d 44, (5th Cir.1975) for a discussion of some of the factors to be considered in determining whether there is likelihood of confusion. For a discussion of some of the evidence which would be useful to proving up such a claim see *Freedom Sav. & Loan Assoc. v. Way,* 757 F.2d 1176 (11th Cir.1985). We note that since it is the consuming public's understanding of the word that is relevant, *American Heritage, supra,* at 11 n. 5; *Bayer Co., supra* at 509, surveys of that audience, if properly conducted, would constitute relevant evidence for purposes of determining to which category a word or phrase belongs.

22. The *need* to use a term because it is generic or highly descriptive should be distinguished from the *desire* to use it because it is attractive. *Compare Bayer Co.* 272 F. 505 (no viable alternative for term "aspirin"), *with Sun Banks,* 651 F.2d 311 ("sun" arbitrary with respect to banking services, but nevertheless a "weak" mark because of extensive third-party use).

23. This is not to imply that the types of evidence outlined above constitute an exhaustive list.

24. This is not to be confused with the likelihood of confusion analysis where the trier of fact looks at *all* third party use, not just use in the same industry, to determine whether a mark is a "weak" or a "strong" mark. *See Sun Banks* 651 F.2d at 315–17.

25. Appellee urges that *American Heritage* stands for the proposition that a word which is commonly used in an industry is not protectable. It argues that the word "Union" is commonly used in the banking industry, therefore UNB–Lare-

do's name is not protectable. In *American Heritage* this court was reviewing a district court's ruling under the clearly erroneous standard. The district court in that case based its ruling on evidence that the definition of the word "heritage" coincided with the business of insurance companies, i.e. "providing 'heritages,' *because* "heritage" meant " 'something transmitted or acquired from a predecessor; a legacy....'," and the insured's beneficiaries were usually family members. *American Heritage,* 494 F.2d at 11. All that was decided was that the district court's reasoning was supported *by the evidence.*

We do not believe that the court in *American Heritage* meant to imply that the owners of facially arbitrary or fanciful marks would not be able to argue for protection of their names in a particular market merely because some *component* of the name was popular within the industry. Appellant is not seeking to protect the word "Union" alone, (thus denying its use to others, in other arrangements), but rather the whole name, in *this precise* arrangement, "Union National Bank" or "Union National Bank of Texas." *See Estate of P.D. Beckwith v. Commissioner of Patents,* 252 U.S. 538, 40 S.Ct. 414, 417, 64 L.Ed. 705 (1919) ("The commercial impression of trade-mark is derived from it *as a whole,* not from its elements separated and considered in detail. For this reason it should be considered in its entirety....") (citations omitted) (emphasis added). Unless widespread industry use can be demonstrated by the evidence to result from the understanding in the industry that the term is generic or descriptive, not merely attractive or popular, we believe that this inquiry more properly goes to the likelihood of confusion issue. *See supra,* note 24.

would not change the result because the trial court did not identify the evidence on which it was basing its conclusion that "Union National Bank" was descriptive.

The district court and the parties were operating under an erroneous view of the law. As the Supreme Court has noted, "[I]f a district court's findings rest on an erroneous view of the law, they may be set aside on that basis." *Pullman–Standard v. Swint,* 456 U.S. 273, 102 S.Ct. 1781, 1789, 72 L.Ed.2d 66 (1982). UNB–Laredo argues that it had additional evidence to present. A review of its list of exhibits reveals that some of them may be relevant to this issue. Appellee successfully argued to the trial court that this was an issue of law.[26] As a result, UNB–Laredo's presentation of its evidence was unduly truncated. We therefore reverse and remand this case to the district court to allow UNB–Laredo the opportunity to present its case.

### CONCLUSION

Concluding that the district court applied an erroneous view of the law, we REVERSE and REMAND to allow the Appellant an opportunity to present evidence regarding the appropriate categorization of its mark.

Johnny Badillo, Big Spring, Tex., pro se.

Henry Oncken, U.S. Atty., James L. Turner, Paula Offenhauser, Jeffrey A. Babcock, Asst. U.S. Attys., Houston, Tex., for plaintiff-appellee.

---

**26.** While Appellee argues in its brief that we should review the trial court's ruling under the clearly erroneous standard because it is a finding of fact, (Brief of the Appellee, p. 8), we note that *at trial* its counsel repeatedly referred to it as an issue of law. *See* Tr.Trans., pp. 73–78.