MARCH MADNESS ATHLETIC
ASSOCIATION, L.L.C.,
Plaintiff,

v.

NETFIRE, INC., and Sports Marketing
International, Inc., Defendants,

v.

National Collegiate Athletic Association, and Illinois High Association, Counter–Defendants.

v.

Matthew Jones, Third Party Defendant.

No. Civ.A. 3:00–CV–398–R.

United States District Court,
N.D. Texas,
Dallas Division.

Aug. 28, 2003.

788

Douglas N. Masters, Bradley L. Cohn, Mark P. McKenna, Ram Padmanabhan, Pattishall, McAuliffe, Newbury, Hilliard & Geraldson, Wayne F. Plaza, Rooks, Pitts & Poust, Chicago, IL, Theodore Stevenson, III, McKool Smith, J. Todd Key, Sullivan, Parker & Cook, Scott M. Kline, Hughes & Luce, Dallas, TX, for Plaintiff/Counter Defendant/Third Party Plaintiff.

R. Brent Cooper, Cooper & Scully, Adam Alexander, David, Goodman & Madole, Dallas, TX, for Defendant/Counter Claimant.

Jeffrey C. Mateer, Randal C. Shaffer, Mateer & Shaffer, Dallas, TX, for Counter Defendant.

R. Brent Cooper, Cooper & Scully, Adam Alexander, David, Goodman & Madole, Dallas, TX, for Third Party Defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

BUCHMEYER, District Judge.

This case concerns the trademark rights to the term *'march madness'* and to the

internet domain name 'www.marchmadness.com.' ("marchmadness.com") Plaintiff March Madness Athletic Association, L.L.C. ("MMAA") brings suit against Sports Marketing International, Inc. ("SMI"), Netfire, Inc. ("Netfire") and Matthew Jones (collectively, "Defendants") alleging cybersquatting, false representation, trademark infringement and unfair competition under the Lanham Act and state law, as well as civil conspiracy under state law. Defendants contend that march madness is a generic term, and that their acquisition and use of www.marchmadness.com was lawful.

This case was originally filed on February 22, 2000 by the Illinois High School Association ("IHSA"), which later amended its Complaint to add MMAA as a Plaintiff. Subsequently, IHSA withdrew from the case, leaving MMAA as the sole Plaintiff of record. On December 11, 2000, this Court denied a motion to dismiss SMI's counterclaims. On August 15, 2001, this Court denied motions for partial summary judgment on the genericness of march madness and on the cybersquatting claim, and granted summary judgment in favor of MMAA on Defendants' conversion counterclaim. *March Madness Athletic Ass'n, L.L.C. v. Netfire,* 162 F.Supp.2d 560 (N.D.Tex.2001). On June 4, 2002, this Court granted summary judgment in favor of MMAA on Defendants' remaining coun-

terclaims of fraud, tortious interference, and civil conspiracy.[1]

On October 7–15, 2002, this Court held a bench trial in this case.[2] At the trial, MMAA presented the claims of trademark infringement, and the National Collegiate Athletic Association ("NCAA") presented the claims of misrepresentation and conspiracy. Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, this Court now makes the following findings of fact and conclusions of law.

## I. FINDINGS OF FACT

### A. ACQUISITION OF MARCHMADNESS.COM

1. Dirk Brinkerhoff ("Dirk") and his brother Phil Brinkerhoff ("Phil") are businessmen who together had formed Sports Marketing International as well as a related entity, Inspark (collectively "SMI"). SMI's only current client is the Dallas Cowboys football team, for whom SMI sells television and radio advertising.

2. Matthew Jones ("Jones") is Phil's son-in-law. Jones had founded Netfire, an internet service provider and consulting firm. Netfire was originally a Utah corporation, but became a sole proprietorship when Jones moved to Dallas in late 1999 or early 2000. At all times relevant to this action, the actions of Netfire were controlled by Jones.

1. Any statements previously made by this Court regarding the facts of this case are, of course, not binding on it now. Such statements were made in the context of motions for summary judgment. By definition such preliminary motions do not offer the Court a full development of the evidentiary record, nor the opportunity to judge the credibility of live witnesses. Most importantly, such statements were not made in the Court's current role as finder of fact. *See, e.g. Watson v. Amedco Steel, Inc.,* 29 F.3d 274, 277 (7th Cir.1994) ("In denying [a motion for summary judgment], the court 'decides only one

thing—that the case should go to trial;' that denial 'does not settle or even tentatively decide anything about the merits of the claim.'") (quoting *Switzerland Cheese Ass'n, Inc. v. E. Horne's Mkt., Inc.,* 385 U.S. 23, 25, 87 S.Ct. 193, 17 L.Ed.2d 23 (1966)).

2. At trial, the Court allowed the parties to submit closing briefs in lieu of closing arguments. Due to a delay in obtaining transcripts, the closing briefs were not filed until June 2003.

3. Sometime in late December 1995 (or early January 1996), Dirk met with Matthew Jones ("Jones") and discussed acquiring the domain name marchmadness.com as SMI was interested in developing a website focused on the NCAA Division I Men's Basketball Championship (the "NCAA Tournament"). Jones informed Dirk that the domain name was available. Dirk requested that Jones acquire marchmadness.com, and Jones agreed to do so.

4. Jones was experienced in the acquisition of domain names, having registered "hundreds" of them on behalf of his Netfire clients. When registering domain names, Jones did not inquire regarding any possible trademark concerns relating to a particular domain name. Instead, his practice was to simply check availability of the domain name. If a client sought a name and it was available from the domain name registrar, Jones registered it. As he testified, he would have registered mcdonalds.com, if a client had asked him to do so. The Court finds Jones' testimony regarding his practice of obtaining registrations without trademark investigation to be credible.

5. In early 1996 when Jones attempted to register Marchmadness.com on behalf of SMI, he learned that it was no longer available, having been registered by another party. Due to the unavailability of marchmadness.com, Netfire registered marchmadness.com with the registrar, Network Solutions, Inc. ("NSI"). Jones then sought to acquire marchmadness.com from its registrant, Adam Stein ("Stein").

6. Stein was a recent college graduate who was running his own computer company, Insanely Great Software ("IGS"), of which he was the only employee. In late 1995, Stein had registered the domain name marchmadness.com, although at the time he did not have any particular plans for its use.

7. In early 1996, Netfire contacted Stein, and subsequently, on February 7, 1996, Netfire and IGS entered into an agreement transferring marchmadness.com to Netfire (the "Transfer Agreement").[3] The Transfer Agreement provided for the transfer of marchmadness.com by IGS to Netfire in exchange for (1) a $25,000 advertising credit on Netfire websites, (2) the transfer of march-madness.com to IGS, and (3) a web link from marchmadness.com to march-madness.com.

8. Unfortunately, the record is rather scarce with respect to Netfire's contacts with Stein prior to the Transfer Agreement. Indeed, it was only in 2001, during his *second* deposition that Jones, when confronted with a copy of the Transfer Agreement, "remembered" that he had not registered marchmadness.com directly from NSI.[4] At trial, Jones testified that he remembers nothing regarding Stein, other than that he entered into the Transfer Agreement with him, and that Jones was certain that it was either Jones or another employee of Netfire, Steve Jenkins ("Jenkins"), who had contacted Stein. Jones also testified that he never informed SMI that he had been unable to register marchmadness.com directly with NSI, or that he had subsequently purchased marchmadness.com from Stein. Dirk similarly testified that he was not informed of Jones' purchase from Stein. Jenkins did not tes-

---

3. NCAA Ex. 7.

4. *See also* NCAA Ex. 10 at 14. In answer to an interrogatory, Defendants state that they "have neither granted any rights to a third party nor acquired any rights from a third party other than those acquired from Network Solutions in association with and respect to the registration of the domain name marchmadness.com." This is not true.

tify, and the parties have stipulated that he "does not recall speaking with or corresponding with Adam Stein and/or anyone with Insanely Great Software."[5] The Court finds Jones' testimony regarding failure to inform Dirk to be credible; the Court also finds Dirk's denial of knowledge of the purchase by Jones to be credible, albeit less so.

9. Although Stein did not testify, excerpts from his deposition were read at trial. In his deposition, he stated that he entered into the Transfer Agreement, in part, because he was given the impression, based on at least one conversation with someone from Netfire, that Netfire was "definitely working together in some way" with the NCAA, and, therefore, had the legal right to the marchmadness.com domain.[6] He stated that he "had no other information" than what he was told by Netfire, and that the offer from Netfire:

> was somewhat of a carrot and stick. [Netfire was] willing to give a consideration to me, but at the same time they were the rightful owners, and it wasn't like I could say no, and it would be done with, that kind of thing.[7]

Thus, Stein was motivated to transfer marchmadness.com to Netfire, at least in part, by a belief, based on statements made by Netfire, that Netfire was affiliated with the NCAA.

10. Netfire has never been affiliated with the NCAA, and thus, any statements averring such a relationship were false.

11. There is no evidence contradicting Stein's recollection, as no one else admits to any recollection of the events in question. Accordingly, this Court concludes,

by a preponderance of the evidence, that Netfire made false representations to Stein regarding an alleged relationship with the NCAA in order to obtain the marchmadness.com domain name. To the extent that Jones denied that he had ever represented himself as affiliated with the NCAA, this Court finds such denials to be without credibility.

12. Within a month after Stein had transferred marchmadness.com to Netfire, he was contacted by counsel for the NCAA regarding the domain name.[8]

## B. USE OF MARCHMADNESS.COM

13. After the acquisition of marchmadness.com, Netfire began developing the content of the website. In developing the website content, Jones took directions primarily from Don Hall ("Hall"). Hall was the Vice–President for Sales of Inspark, and Inspark's only employee other than Dirk (who spent only about a quarter of his time working at Inspark). Hall managed the day to day administration of the site. Although Hall did not testify at trial, the parties have submitted his deposition transcript to this Court.

14. Hall carefully managed the day to day administration of the site, and gave detailed instructions to Jones on its content. For example, in a memo dated January 10, 1996, Hall provided a time line for the roll-out of features on the marchmadness.com website.[9] The proposed time line precisely corresponded to events in the NCAA Tournament and covered the period from February 14 to May 15, 1996. Thus, for example, March 14–17 were the "1st & 2nd Rounds," March 21–24 were

---

**5.** NCAA Ex. 12.

**6.** Transcript Vol. 1 at 131.

**7.** Transcript Vol. 1 at 143. *See also, id.,* at 129–31, 144.

**8.** Plaintiff's Ex. 87 (letter dated February 26, 1996).

**9.** Plaintiff's Ex. 111.

the "Regional Finals," and March 30–April 1 were the "Final Four." For each time period, results of games were to be posted, as well as phases of various NCAA Tournament-inspired contests. The last two entries in the proposed time line were for compiling data on the number of visitors to the site and contestants in the contests, and delivering that information to the sponsors of the website, in other words, reporting back to the advertisers.

15. All of the content of the marchmadness.com was related to the NCAA Tournament.

16. Marchmadness.com was a commercial website.

17. After receiving a cease and desist letter from the NCAA in February 1996, SMI decided not to go forward with the website for the 1996 NCAA Tournament. However, later in the year, SMI, Netfire, and Jones resumed work on the site with the intention of the site fully operational in February 1997, *i.e.* in time for the 1997 NCAA Tournament.

18. On August 5, 1996, Hall sent an email to Jones which, *inter alia,* directed Jones to add a disclaimer to the homepage of the site to read: "MARCHMADNESS.COM IS NOT AFFILIATED WITH NOR SANCTIONED BY THE NATIONAL COLLEGIATE ATHLETIC ASSOCIATION." [10] The email also instructed Jones to "[m]ake sure the word 'official' is taken out and MARCHMADNESS.COM is used instead of only marchmadness." [11] In his deposition, Hall explained that he wanted to use the disclaimer to avoid "confusion," and marchmadness.com rather than marchmadness alone because he knew that

Defendants did not own marchmadness, they only owned the domain name. He also wanted the word 'official' removed to avoid connoting an affiliation with the NCAA. However, as noted above, the website was *entirely* about the NCAA Tournament— and about nothing else.

19. Hall stated that Defendants chose the address marchmadness.com because they wanted to do a site about the NCAA Tournament. The address would be attractive to advertisers because "it is definitely related to the tournament." [12]

20. When asked who was the intended audience for Defendants' marchmadness.com website, Hall replied: "Gosh, anybody that's a fan of basketball who followed the [NCAA] tournament. Obviously, a male audience. Probably 18 to 34, 18 to 49 years of age demographically. Maybe 25 to 54." [13]

21. SMI, specifically Hall, devoted significant energy to soliciting advertising for the marchmadness.com website. Toward this end, he created a power-point presentation, and mailed printed copies of this presentation (the "deck") to potential advertisers, after first contacting them to make an initial sales pitch.[14] The deck, other correspondence from Hall, and his phone conversations with potential advertisers emphasized the value of being affiliated with the NCAA Tournament. For example, a letter from Hall to Rawlings Sporting Goods ("Rawlings"), a manufacturer who was a licensee of the NCAA, stated that marchmadness.com is "a website dedicated to the NCAA basketball tournament" and that "Marchmadness.com is going to receive literally millions of hits before, during and after the tourna-

---

10. Plaintiff's Ex. 110 (emphasis in the original).

11. *Id.*

12. Deposition of Don Hall, at 98.

13. *Id.,* at 40.

14. Defendants' Ex. 10.

ment."[15]  The deck states that "Marchmadness.com will be *THE* interactive sports site following the Men's Collegiate Division I Basketball Tournament."[16]  A disclaimer was contained in some, but not all, versions of the deck.[17]

22.  Hall contacted dozens of prospective advertisers covering a wide variety of industries.[18]  By his own estimate, approximately 25% of the advertisers Hall contacted inquired, on their own initiative, as to whether marchmadness.com was affiliated with the NCAA. Indeed, Hall stated that, in one case, a potential advertiser he spoke with expected to be able to advertise on marchmadness.com for free because the corporation was already a corporate sponsor of the NCAA.

23.  Sometime in 1997, the marchmadness.com website went 'live,' *i.e.* became accessible to any user of the internet who typed www.marchmadness.com in his or her browser.  Although the version that went live did not have the full capabilities envisioned by Defendants, the essential framework of those capabilities was in place.[19]  The site, devoted exclusively to the NCAA Tournament, was live from 1997 to July 1999, although it was inaccessible for a few months during 1998 due to a server malfunction.  In other words, the site was accessible to any user of the internet for a period of approximately 1½ to 2 years.  The site contains the image of the bracket for the 1997 NCAA Tournament and makes use of the NCAA's 1997 Final Four logo.  Recognizing that the Final Four logo is the property of the NCAA, both Jones and Dirk testified that the logo

was there accidentally and should have been removed.  This Court finds the testimony from Jones and Dirk regarding the 'accidental' use of the Final Four logo to be entirely without credibility.

24.  The marchmadness.com site also does not contain a disclaimer on the first page as suggested in Hall's memo mentioned *supra*, although testimony at trial suggested that a disclaimer might not print out if it was a moving 'crawler' at the bottom of the page.  Defendants were in the best position to offer additional technical evidence of such a scrolling disclaimer, and did not.  The only disclaimer contained in the print out of the site is hidden in the section of frequently asked questions, and is not even a full question such as "is this site affiliated with the NCAA?," but rather juxtaposed in an odd position after a question regarding eligibility to enter the website's contests.[20]  Such placement certainly does not indicate a desire to place the disclaimer in a prominent position where all visitors to the site are likely to come upon it.

25.  During his trial testimony, Dirk made a variety of wholly unpersuasive attempts to describe the marchmadness.com website as something other than what the overwhelming weight of the evidence demonstrates, namely that it is a commercial site intending to derive financial benefit from the NCAA Tournament.  Dirk stated that marchmadness.com was not intended to be a commercial site, but rather an "informational" site.  He also stated that marchmadness.com was not even intended to be a site primarily about the NCAA Tour-

---

15.  Plaintiff's Ex. 59.

16.  Defendants' Ex. 10, at 3 (emphasis in the original).

17.  *Compare* Defendants' Ex. 10 (disclaimer on page 2) *and* Plaintiff's Ex. 59 (no disclaimer).

18.  Plaintiff's Ex. 109 (list of advertisers which were contacted).

19.  Plaintiff's Ex. 1 (printout of pages of the website).

20.  *Id.,* FAQs, at 2.

nament, but rather, that he had a "long-term" vision of marchmadness.com as a site covering all sports. There is not a shred of evidence in the record to support the notion of such a long-term plan. This Court finds Dirk's assertions of his 'long-term plan' to be entirely without credibility. Indeed when pressed about his long-term vision by opposing counsel, Dirk admitted that he had never written anything down about the vision, never had a conversation about the vision with Hall or Jones, and "whether [it] was in everybody's mind, or just in my mind or whatever, I don't know."[21]

26. More generally, this Court finds Dirk's testimony, except as otherwise specifically noted in these Findings of Fact and Conclusions of Law, to be of *very* low credibility.

27. In January 1996, the NCAA learned, for the first time, of the imminent launch of Defendants' marchmadness.com website. An employee of Rawlings forwarded a letter, dated January 16, 1996, which it had received from Hall promoting the marchmadness.com website.[22] The letter was forwarded to Host Communications, Inc. ("Host") who in turn forwarded it to the NCAA. Shortly thereafter, on February 5, 1996, counsel for the NCAA sent a cease and desist letter to defense counsel for SMI.[23] The letter very clearly states that:

> The name of the project [marchmadness.com], in the context in which your client is using it, infringes on the NCAA's common law mark "March Madness."[24]

Thus as of early February, 1996, SMI was on notice that the marchmadness.com website was potentially violative of the NCAA's *common law* trademark rights in march madness. The letter, in closing warned that: "the NCAA will vigorously pursue any and all legal relief to which it may be entitled by virtue of your client's conduct."[25]

28. During 1996, IHSA also independently learned of the existence of SMI's proposed marchmadness.com website. David Fry ("Fry"), the retired executive director of the IHSA, testified that in the mid 1990's, after developing the www.ihsa.org website, IHSA sought to register both www.marchmadness.org and www.marchmadness.com. However, marchmadness.com was unavailable. Upon learning this, counsel for IHSA sent a cease and desist letter, dated October 14, 1996, to Hall at SMI.[26] The letter stated that IHSA was the "owner of all rights to the trademark MARCH MADNESS, including Federal Trademark Registration No. 1,571,340."[27] Thus, IHSA thereby put Defendants on notice that it claimed registered as well as common law rights to march madness.

29. This Court finds Fry's testimony to be highly credible, and credits it in its entirety.

30. Defendants chose to reject the NCAA and IHSA's claims to march madness. After a short pause in development of the site, Defendants continued adding content to marchmadness.com, hoping to go live in time for the 1997 NCAA Tournament.

**21.** Transcript Vol. 6, at 55.

**22.** Plaintiff's Ex. 59, at 1.

**23.** Plaintiff's Ex. 86.

**24.** *Id.,* at 1.

**25.** *Id.,* at 2.

**26.** Plaintiff's Ex. 34.

**27.** *Id.,* at 1.

31. In 1998, IHSA requested that NSI place marchmadness.com on "hold" if it was not relinquished by Defendants.[28] Michael Palage, an expert on domain name registration, testified that putting a domain name on hold is analogous to unplugging a person's phone line; it pulls the domain name out of circulation and makes it inaccessible to anyone typing that address in their browser.

32. In late June 1999, marchmadness.com was placed on hold by NSI. By letter dated January 24, 2000, NSI notified counsel for IHSA that, due to a change in NSI's domain name dispute resolution policies, marchmadness.com would no longer be on hold after February 23, 2000 unless NSI received a copy of court documents related to the domain name registrant.[29] On February 22, 2000, this case was filed.

33. On April 4, 2000, this Court Ordered the certificate of registry for marchmadness.com to be deposited with this Court, where it remains today.

## C. THE HISTORY OF 'MARCH MADNESS'

34. Since 1908, IHSA has organized an annual boy's high school basketball tournament in Illinois (the "IHSA Tournament"). In 1942, a poem was written about the IHSA Tournament which included the following verse:

> The gym lights gleam like a beacon beam
>> And a million motors hum
> In a good will flight on a Friday night;
>> For basketball beckons, "Come!"

> A sharp-shooting mite is king tonight.
>> The *Madness of March* is running.
> The winged feet fly, the balls sail high
>> And field goal hunters are gunning.[30]

Since the 1940s, IHSA has used the term march madness to refer to the IHSA Tournament, which has been broadcast on television in Illinois since 1952. March madness is widely used by print and broadcast media in Illinois to refer to the IHSA Tournament.[31]

35. For most of its history, IHSA has given little thought to issues of intellectual property. As a small non-profit interscholastic athletic association, IHSA was focused on arranging high school athletic competitions for its member schools. Indeed, although IHSA was founded in 1900, it did not register its own name as a trademark until the late 1980s.

36. In 1990, when IHSA, for the first time, sought to register march madness, it discovered that the term had been registered as a service mark by Intersport on December 12, 1989. Intersport's registration was for "entertainment services, namely, presentation of athletic and entertainment personalities in a panel forum" and claimed a first use in commerce on March 10, 1986.[32] Intersport is a corporation, based in Chicago, Illinois, which uses march madness for sports programs it produces. The programs are panel discussions by sports commentators regarding the NCAA Tournament.[33] When IHSA

---

28. Plaintiff's Ex. 35; *see also* Plaintiff's Ex. 36 (second letter from IHSA to NSI).

29. Plaintiff's Ex. 38.

30. Plaintiff's Ex. 13 at 5 (emphasis added). There is also evidence that the poem or some other reference to March Madness emerged as early as 1939.

31. *See* Plaintiff's Ex. 16 (newspaper articles) and 17 (video excerpts).

32. Plaintiff's Ex. 91 at 6.

33. *See* Plaintiff's Ex. 32 (cd-rom containing video clips). The video clip under file name "03–93 MM Finals in New Orleans" states that "the following is an Intersport Presenta-

learned of Intersport's registration, it filed a petition for cancellation with the U.S. Patent and Trademark Office (the "PTO"). However, Intersport and IHSA subsequently decided to pool their trademark rights into a new entity, March Madness, LLC ("MMLLC").[34] MMLLC was in existence from December 1994 to July 1995, and was terminated after Intersport and IHSA reached a new arrangement, dated July 24, 1995, whereby Intersport assigned its registered service mark to IHSA in exchange for receiving a perpetual license to use march madness for its sports programming involving panel discussions and a share of royalty payments received by IHSA.[35]

37. In addition to march madness, IHSA, in 1990 or 1991 began using the term "America's Original March Madness" to refer to the IHSA Tournament, and in 1997 began using the term "March Madness experience" to refer to basketball related activities which occurred parallel to the IHSA Tournament. Both "America's Original March Madness" and "March Madness Experience" were subsequently registered by the IHSA.[36]

38. From the early 1990s, IHSA began licensing march madness. At this time, IHSA claimed that it held the exclusive rights to march madness and, therefore, was willing to license it for any use, without regard to whether it related to the IHSA Tournament. Among IHSA (or MMLLC's) licensees were Wilson Sporting Goods, Pepsi, and the *Chicago Tribune*.[37] In addition to licensing march madness to corporations, IHSA sought to license it to other state high school associations. In so doing, IHSA's motive was not financial gain (each license was $10), but rather to strengthen the goodwill associated with march madness, and to strengthen high school sports outside of Illinois by providing other states with a term that would, as Fry testified, "give them a good promotional punch."[38] Approximately half the states acquired licenses to use march madness. Under the state licenses, a state high school athletic association could use the term march madness if such use was preceded by the name of the state, *i.e.* Nebraska March Madness or Iowa March Madness.[39]

39. Once it began licensing march madness, IHSA also began enforcement actions to prevent unauthorized uses of the term. Generally, if IHSA became aware of a use of the term which it perceived to be inappropriate, it would send out a letter warning the party that IHSA had trademark rights which it would act to enforce. Among the enforcement letters IHSA wrote were to a car dealership, a carpet store, a towel service, Oldsmobile, and

---

tion," and file name "20–00 ESPN MM Tournament 3" includes credits which state that the program was "Produced by Intersport Television in association with ESPN."

**34.** Plaintiff's Ex. 31.

**35.** Plaintiff's Ex. 30.

**36.** *See* Plaintiff's Ex. 91.

**37.** *See* Defendants' Ex. 118 (Wilson license); Plaintiff's Ex. 21 (Pepsi license); Plaintiff's Ex. 20 (*Chicago Tribune* license).

**38.** Transcript, Vol. 2, at 202; *see also* Plaintiff's Ex. 29 (copies of state license agreements).

**39.** Defendant's Ex. 119, 140. One state high school association, the Michigan High School Athletic Association responded to IHSA's licensing offer by stating that it believed IHSA did not have rights to the term march madness, however, IHSA, as Fry testified, did not perceive this to be of particular concern as the same letter also stated that the MHSAA did not use and had no intention of making future use of the term march madness. *See* Defendant's Ex. 120.

CBS.[40] Prior to this case, the sole lawsuit which IHSA brought to enforce its rights was brought in 1996 against GTE Vantage, which at the time was a licensee of the NCAA.

40. In addition to the rights in march madness claimed by IHSA (and Intersport), rights to march madness were also claimed by the NCAA. The first use of march madness by the NCAA (or its licensees) is generally traced to the 1982 NCAA Tournament when a CBS broadcaster, Brent Musberger, described the NCAA Tournament as "March Madness."

41. Doug Trowley, the creative director of CBS Sports for the past twenty years, testified that, the phrase march madness as a nickname for the NCAA Tournament immediately stuck and has been used by CBS, as the licensed broadcaster of the NCAA Tournament, ever since. March madness has become one of the monikers, along with others such as the "Road to the Final Four," which CBS uses to promote the NCAA Tournament during the year, and, of course, most frequently during the period immediately preceding and during the NCAA Tournament.[41] March madness, according to Trowley, is a particularly useful nickname for the NCAA Tournament because the full title, the NCAA Men's Division I College Championship, is a bit lengthy. This Court finds the testimony of Trowley to be highly credible.

42. Moreover, Melissa Caito, the current Director of Licensing and Brand Management testified that march madness is particularly useful to licensees because the term describes the entire NCAA Tournament, while other terms which are either trademarked or licensed by the NCAA, such as "Sweet Sixteen" and "Elite Eight" are only useful for a short while during the tournament. This Court finds the testimony of Caito to be highly credible.

43. The NCAA Tournament has grown into a major event on the annual American sports calendar, in the words of one television commentator, it is "the three-week hardwood holiday known as March Madness." [42] CBS broadcasts every game of the NCAA Tournament nationally, superceding its regularly scheduled programming, and making, according to Trowley, a "huge" investment in staff and equipment in order to be able to broadcast from the various game sites. The NCAA Tournament earns strong Nielsen ratings, particularly the national championship and national semifinals, which may be among the most highly rated sports programs during a given year.[43] For CBS, Crowley testified, the value of the NCAA Tournament arises not only from the advertising revenues it generates, but also because it can be used as a vehicle to promote other CBS programming to the viewing audience of the NCAA Tournament.

44. According to John Waters, the former director of licensing of the NCAA for the period from 1979 through 1995, the NCAA began licensing march madness in 1988. Rather than being licensed separately, march madness was typically included as one of a set of marks relating to NCAA championship. The NCAA licensed the marks as a group in order to encourage corporations to develop advertising not just for one event but across a range of sports. NCAA advertisers were

40. *See* Defendants Ex. 122 (car dealership); 128 (carpet store); 127 (towel service); 126 (Oldsmobile); and 130(CBS).

41. Plaintiff's Ex. 42 (cd-rom containing video clips from the NCAA Tournament).

42. *Id.* (video clip titled "05–96 CBS Pregame").

43. Plaintiff's Ex. 44 (2001 Nielsen data); *see also* Plaintiff's Ex. 43 (1999 Nielsen data).

known as 'Corporate Partners.' A list of marks was updated and provided to licensees annually. The 1993 and 1995 lists of marks both include march madness.[44]

45. Due to tax concerns relating to the NCAA's non-profit status, the NCAA licenses all of its marks to one entity, which then sublicenses them to individual corporations. Between 1988 and 1995, the NCAA received up to $4 million annually in royalties from NCAA licensees.[45] From 1997–2002, Host paid the NCAA $75 million to serve in this role as primary licensee and administrator of its Corporate Partner program, as well as for other broadcast rights.[46] With the expiry of the Host contract, the role formerly played by Host is now carried out by the Collegiate Licensing Program.

46. The NCAA (and its primary licensee) exert considerable quality control over licensed use of the NCAA's marks. Licensees were required to submit drafts of all merchandise and advertising copy which made use of the licensed marks for approval. In many instances either John Waters, other staff at the NCAA, or employees at Host would add a superscripted TM (or SM) to the term March Madness, or a legend that March Madness is a trademark of the NCAA.[47] Mark Kidd, the president of Host, estimated that, during the period of its contract with the NCAA, Host reviewed approximately five to ten *thousand* drafts of merchandise and advertising copy. This Court finds Kidd's testimony to be highly credible.

47. However, it should also be noted that not all of the NCAA's licensing contracts include the term march madness as a claimed mark. Several agreements included lists of terms in introductory 'whereas' clauses which omitted march madness. While the Handbook for Corporate Partners does list march madness, the license agreement between Host and the NCAA did not.[48] Similarly, the website and cybercasting agreements with Host, both omit explicit mention of march madness.[49] However, exhibit B of the license agreement, a sample sublicense agreement, defines "Marks" broadly to include "the NCAA name and all related marks." Mark Kidd testified that, although a particular mark might be omitted in one contract, the intent of the NCAA and Host, based on their "daily" interaction was to include all the NCAA championship marks including march madness, and all the marks, including march madness, were included in the annual list of marks which was given to licensees. The agreement between the NCAA and Andrews and McNeil Company is an example of a license agreement which explicitly lists the term march madness as a covered mark.[50] This Court finds Kidd's testimony to be highly credible.

48. As its licensing program developed, the NCAA became more focused on enforcement of its rights against unauthorized users. The earliest enforcement letter from the NCAA relating to alleged unauthorized use of march madness is dated November 2, 1993 and is addressed to

**44.** Plaintiff's Ex. 3 at 1–2.

**45.** Plaintiff's Ex. 4.

**46.** Defendants' Ex. 69 at 6.

**47.** Plaintiff's Ex. 2 (review by John Waters); Plaintiff's Ex. 48, 50, 52, 53, 56 (review by Host).

**48.** *Compare* Plaintiff's Ex. 42 (handbook) *and* Defendants' Ex. 69 (agreement between Host and the NCAA).

**49.** Plaintiff's Ex. 70 (website agreement); Plaintiff's Ex. 71 (cybercasting agreement).

**50.** Plaintiff's Ex. 10.

the developer of a trivia game which would have march madness in its title.[51] An early example of a response letter from a party who complies with the NCAA's enforcement letter is the letter, dated December 28, 1994, which states that the alleged infringer would no longer run ads or sell software using the words march madness.[52]

49. More recently, in the past several years, the NCAA has been more vigorous in enforcement of marks which it claims to own. Scott Bearby ("Bearby"), assistant general counsel of the NCAA since 1999, estimates that the NCAA now sends approximately 300 cease and desist letters annually, of which approximately 50 to 70 involve unauthorized use of march madness. The NCAA has also been more active using the uniform domain name dispute resolution policy (the "UDRP") to obtain web addresses. According to Bearby, many parties transfer contested domain names rather than engaging in dispute resolution procedures pursuant to the UDRP. Among the domain names which the NCAA has been able to acquire from other parties in recent years are www.wwwmarchmadness.com, www.finalfour2001.org, and www.marchmadness2001.net.[53]

50. In many instances, as evinced in the documentary record and the testimony of Bearby and Caito, the NCAA's decision to send a cease and desist letter for uses of march madness appears to be motivated as much, if not more by business concerns, *i.e.* whether the NCAA already has a corporate partner in that particular industry, rather than legal concerns.[54] Thus the

NCAA is particularly concerned about the use of March Madness by Menard's, a home improvement store even though the use does not incorporate a visual basketball motif, because Sears is a Corporate Partner and sells many of the same goods.

51. While the NCAA has long had a policy of registering its marks, there has not been "any consistency in the approach taken" with respect to when or if a particular mark was registered.[55] Like IHSA, the NCAA waited approximately 60 years to register its own name, and like IHSA, the NCAA did not oppose the Intersport march madness registration in 1989. However, like IHSA, the NCAA later filed a cancellation petition regarding the Intersport registration with the PTO. In the last few years, the NCAA has been much more active in registering its marks.

### D. Formation of MMAA

52. With both the NCAA and IHSA claiming exclusive rights to basketball-related, and indeed all commercial uses of march madness, it is not surprising that they eventually came to loggerheads over the issue of ownership of March Madness. In 1996, IHSA sued GTE Vantage seeking to enjoin it from using the term march madness despite the fact that GTE Vantage had a license from the NCAA to do so. In the suit IHSA claimed it owned the exclusive rights to commercial use of march madness in relation to basketball. In December 1996, the Seventh Circuit Court of Appeals, in *IHSA v. GTE Vantage*, 99 F.3d 244, 247–48 (7th Cir.1996) (*"GTE Vantage"*), rejected any claim

---

**51.** Plaintiff's Ex. 9.

**52.** Plaintiff's Ex. 8.

**53.** Plaintiff's Ex. 83, 85.

**54.** *See, e.g.,* Defendants' Ex. 79 (Menard's home improvement store); Defendants' Ex.

74 (1–800 USA Hotels); Defendants' Ex. 99 (Nissan car dealership).

**55.** Transcript vol 5, at 56; *see also* Transcript vol 2 (testimony of John Waters).

IHSA had to rights over march madness in the context of the NCAA Tournament.

53. After *GTE Vantage,* IHSA and the NCAA engaged in several years of negotiations before agreeing to pool their trade and service mark resources in march madness into a new entity to be jointly managed between them. On February 29, 2000, one week after this case was filed, the IHSA and NCAA formed MMAA. MMAA is an Illinois limited liability company.[56]

54. Under the terms of the agreement between the NCAA and IHSA (the "MMAA Agreement"), the NCAA and IHSA each assigned all rights it held in march madness, including pending applications at the PTO, to MMAA, and in return each received an exclusive, perpetual license from MMAA for use of the term in relation to their respective basketball tournaments.[57] The NCAA's license allows for use of march madness:

> solely in reference to the annual men's and women's collegiate basketball tournament series for Division I NCAA schools which begins in March of every year and results in final games usually occurring sometime in the first week of April, and with goods and services associated with or promoting the NCAA [men's and women's] Tournament provided that as a condition of the license, the NCAA agrees always to include indicia sufficient to indicate that the licensed mark is referencing the NCAA [men's and womens'] Tournament.[58]

Similarly, the license granted by the MMAA to IHSA allows for use of march madness:

> solely in reference to the annual high school basketball championship tournaments for girls and boys, which take place in or about March, and with goods and services associated with or promoting such high school basketball tournaments, provided that as a condition to the license IHSA agrees always to include indicia sufficient to indicate that the mark is referencing a high school basketball tournament.[59]

the MMAA Agreement also grants licenses to use the terms 'America's Original March Madness' and 'March Madness Experience' "in connection with basketball tournaments other than college tournaments, and with goods and services related to basketball."[60] Both IHSA and the NCAA are authorized to sublicense march madness within the scope of their respective licenses. MMAA retains all rights to license march madness other than those licensed to either the NCAA or the IHSA. Each such non-IHSA, non-NCAA license must be approved by a majority of the MMAA board of managers (the "Board"). The Board consists of two representatives each from the NCAA and IHSA, and meets quarterly. The MMAA Agreement also includes provisions relating to the sharing of royalties between IHSA and the NCAA.

55. Gary Krugman, an expert witness for Plaintiff, testified that specialized holding companies which consolidate ownership of trade and service marks are common in industry. Examples include Nestlé, which pools all of its trademarks into a Swiss holding company and then licenses them back to individual Nestlé companies, and Reed Elsevier, which is a holding company for trademarks such as LexisNexis and

---

56. Plaintiff's Ex. 11.

57. Plaintiff's Ex. 12, §§ 2–10.

58. *Id.,* § 4.

59. *Id.,* § 7.

60. *Id.,* § 9.

Martindale–Hubbard. Another similar structure in the world of sports is NFL Properties. Each team in the National Football League transfers its trademarks, e.g. the Dallas Cowboys, to NFL properties, and is then granted a license for their use. On cross-examination, however, Krugman admitted that he is not familiar with the precise details of the structure of NFL properties.

56. MMAA holds title to the following trade or service mark registrations relating to march madness:

| Mark (trademark or service mark) | Number (Date Registered) | Description of Goods and Services |
|---|---|---|
| (1) March Madness (SM) | 2,485,443 (9/4/01) | Entertainment in the nature of basketball tournaments between college teams, in class 41. |
| (2) March Madness (SM) | 2,574,780 (6/4/02) | Entertainment services, namely, organizing and conducting high school basketball games and tournaments, in class 41. |
| (3) March Madness (SM) | 1,571,340 (12/12/89) | Entertainment services, namely, presentation of athletic and entertainment personalities in a panel forum, in class 41. |
| (4) March Madness (TM) | 2,525,317 (1/1/02) | Sporting goods; namely, basketballs, basketball backboards and basketball hoops, in class 28. |
| (5) March Madness (TM) | 2,478,254 (8/14/01) | Wearing apparel associated with an annual basketball tournament between college teams; namely, tee shirts, sweatshirts, sweat pants, caps, sweaters and jackets, in class 25. |
| (6) March Madness (TM) | 2,425,958 (2/6/01) | Basketballs, basketball backboards and related accessories, namely, pumps, inflation needles and nets, in class 28. |
| (7) March Madness (TM) | 2,425,962 (2/6/01) | Pre-recorded video cassettes featuring sporting events, in class 9; Programs, folders, handbooks, magazines and trading cards related to interscholastic activities, in class 16; Cups and mugs, in class 21; Towels and cloth banners, in class 24; Clothing, namely shirts, sweatshirts, shorts, and hats, in class 25. |
| (8) America's Original March Madness (SM) | 2,447,259 (5/1/01) | Sanctioning, supervising, regulating and conducting high school basketball games and tournaments, in class 41. |
| (9) America's Original March Madness (TM) | 1,866,144 (12/6/94) | Programs, stationery folders, books and magazines concerning interscholastic activities, in class 16. |
| (10) America's Original March Madness (TM) | 1,870,486 (12/27/94) | Ornamental pins, in class 14. |

| (11) | America's Original March Madness (TM) | 1,873,048 (1/10/95) | Cups and mugs, in class 21; Towels and cloth banners, in class 24. |
|---|---|---|---|
| (12) | America's Original March Madness (TM) | 2,425,960 (2/6/01) | Trading cards related to interscholastic activities, in class 16. |
| (13) | March Madness Experience (TM and SM) | 2,608,347 (8/20/02) | Clocks and ornamental pins, in class 14; Cups, in class 21; Wearing apparel, namely, caps, t-shirts, sweatshirts, in class 25; Entertainment services in the nature of amusement facilities, in class 41. |

The above table demonstrates that nearly all of these registrations were obtained within the past two years, while this case has been pending. The only 'march madness' registration to predate this case is the former Intersport registration (*supra* no. (3)) for panel presentations of athletic and entertainment personalities, and three 'America's Original March Madness' registrations for publications relating to interscholastic (i.e. high school) activities, and pins, cups, and mugs (*supra* nos. 9–11).[61]

### E. 'MARCH MADNESS' IS A TRADEMARK

57. After considering the full evidentiary record in this case, this Court finds that the phrase 'march madness' is a protectable trademark, and is not a generic term.

58. A more difficult question arises in determining which trademark category to place march madness in. Specifically, the question is whether march madness is a suggestive mark or a descriptive mark which has acquired secondary meaning. The categories themselves are constructs which represent points along a spectrum. After careful consideration of the evidence, this Court finds that 'March Madness' is a descriptive mark which has acquired sec-

ondary meaning, and is, therefore, protectable as a trademark.

59. The phrase 'march madness' is not contained in general reference dictionaries, although its constituent components, march and madness, are.[62] March, of course, among its other meanings, refers to the third month of the year. The first definition of madness, according to *Webster's Dictionary,* is "the quality or state of being mad: as rage, insanity, extreme folly, ecstasy [and] enthusiasm." [63] Putting march and madness together, it is reasonable to assume that the phrase would refer to something mad in March. Thus the phrase is descriptive of some of its underlying qualities, namely, the time the tournaments occur and the high level of energy or enthusiasm with which they are associated. However, there is nothing inherent in the phrase march madness which would lead one who had never heard the term before to understand that it relates to basketball tournaments-either high school or the NCAA Tournament. Comprehension of the meaning of the phrase, therefore, requires imagination, in much the same way that comprehension of the title, *Business Week,* requires imagination even though it is readily apparent that the title

61. *See* Plaintiff's Ex. 91 (copies of march madness registered marks).

62. *See* Plaintiff's Ex. 76 (excerpts from dictionaries).

63. *Merriam Webster's Collegiate Dictionary* 698 (10th ed.1994). The second definition for madness is "any of several ailments of animals marked by frenzied behavior, specfic[ally] rabies."

has something to do with business and the time period of one week.

60. March madness is not a phrase which is inherently necessary in order to describe basketball tournaments occurring in March. It is not difficult to conjure up other appellations for such tournaments which do not use the phrase March madness, i.e., 'Spring Championship,' 'Basketball League Finals,' etc. Other parties seeking to hold basketball tournaments in March, are not left unable to describe their tournaments by virtue of the protection accorded March Madness. The best example of this is the National Invitational Tournament (the "NIT") which also involves NCAA Division I Men's basketball teams and occurs nearly simultaneously to the NCAA Tournament.

61. March madness has acquired secondary meaning in the mind of the public.[64] Gary Mantis ("Mantis"), commissioned as an expert witness by the Plaintiff, conducted a Teflon survey, and concluded that the primary significance of March madness, to members of the public over the age of 18 who are likely to visit a sports website, is as a trade name relating to basketball. The survey, conducted in January 2001, asked its participants to give their opinion as to whether March madness was a 'trade name' or a 'common name.' While the survey was not ideal in every respect,[65] this Court finds the survey's methodology, administration, and universe to be of suffi-

cient quality that the survey results can be considered credible. The results are indicative of the understanding of likely visitors to the marchmadness.com website of the nature of the phrase March madness.

62. The survey was a double-blind survey; neither the person administering the survey nor the person taking it knew what the survey was intended to demonstrate. Approximately 700 adults were contacted by phone based on a list of randomly generated residential phone numbers from the continental United States. The 'next birthday technique' was used to randomly select the actual respondent to the survey within each residence which was called. Not everyone who was contacted was deemed 'qualified' to respond to the survey. Qualified respondents were those who (1) within the last 30 days had used (or in the next 30 days were likely to use) the internet for something other than email, (2) within the last 30 days had read about or attended a sports event (or were likely to do so within the next 30 days), and (3) were able to demonstrate, on the first part of the survey, that they understood the difference between trade names and common names. The respondents were asked to classify terms as either 'trade names' or 'common names.' The sequence of terms was rotated on different surveys in order to avoid term order bias. Of 215 qualified respondents, 180 had heard of March madness, and 150 associat-

64. Plaintiff's Ex. 95, 95a, 95b.

65. In particular, the Court notes that one of the sample questions was whether "Double Header" is a trade name or a common name. Mantis apparently believed it to be a common name. On cross-examination, Defense counsel stated in a question (without offering evidence) that Double Header had been trademarked for a sports related use in 1920. After conducing a search at the PTO's internet site, www.uspto.gov, this Court takes judicial notice, pursuant to Rule 201(b)(2), that

a trademark for a graphical design and text for 'Double Header' to be used for baseballs was registered on July 13, 1920 (Registration No. 133, 114). See FED. R. EVID. 201(b)(2) ("[a] judicially noticed fact must be one not subject to reasonable dispute that is ... capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned"); *Scanlan v. Texas A & M University*, 343 F.3d 533, 536–37 (5th Cir.2003). This fact does not materially impact the value of the results of the survey.

ed it with basketball. Of the 150 who associated March madness with basketball, 98 (61.3%)stated that it was a trade name, 48(32%) stated that it was a common name, and 9(6%) said they did not know. In other words, within the relevant sample of persons who knew March madness was related to basketball, over 60% classified it as a trade name. Based on this evidence, the Court finds that March madness has acquired secondary meaning as a trade name.

63. Defendants have not offered any survey evidence.

64. Moreover, the Court also notes that Trowley testified that CBS uses the term March madness in its national broadcasts of the NCAA tournament and related programming because it believes that the public understands the term to mean the NCAA Tournament. Trowley also testified that he, personally, has interviewed approximately 200 people to ask them if they associate March madness with the NCAA Tournament. In addition, the Court notes the many media uses of March madness to refer to the NCAA Tournament, including crossword puzzles in both the *New York Times* and *USA Today* which have as their clue: "March Madness org" and for the answer "NCAA." [66]

F. LIKELIHOOD OF CONFUSION BETWEEN 'MARCH MADNESS' AND 'MARCHMAD-NESS.COM'

65. This Court finds a strong likelihood of confusion to exist between the protected trademark March madness and Defendants' website, marchmadness.com. The factors to be examined in determining likelihood of confusion include, but are not limited to: (1) the type of mark allegedly infringed; (2) the similarity between the two marks; (3) the similarity of the products or services; (4) the identity of the retail outlets and purchasers; (5) the identity of the advertising media used; (6) the defendant's intent; and (7) any evidence of actual confusion. *Pebble Beach Co., v. Tour 18 I Limited,* 155 F.3d 526, 543 (5th Cir.1998). Each of these factors is examined below.

66. March madness is a strong mark within the context of basketball. Defendants have introduced numerous third party uses of the march madness in commercial settings, including some involving other sporting events such as a volleyball tournament and a long distance race.[67] Within the scope of basketball, however, Defendants have failed to establish anything other than isolated instances of unauthorized use by parties other than the MMAA (or its predecessors in interest). Defendants have not shown any examples of trademark registrations for March madness, or confusingly similar terms, by parties other than the MMAA (or its predecessors in interest). And, as previously noted, SMI's website is entirely devoted to the NCAA Tournament.

67. The phrase march madness and domain name marchmadness.com are identical. The domain name omits the space between march and madness, and adds the suffix ".com." It is otherwise indistinguishable from march madness The differences in visual appearance are insignificant and arise from the formatting necessities of domain names, in much the same way that 'earnestandjuliogallo.com' is identical to "Ernest & Julio Gallo." *See E & J Gallo Winery v. Spider Webs Ltd.,* 286 F.3d 270, 272 (5th Cir.2002).

---

66. Plaintiff's Ex. 66; *see also* Plaintiff's Ex. 64 (media uses); Plaintiff's Ex. 99 (excerpt from the *Complete Idiot's Guide to Basketball*).

67. *See* Defendant's Ex. 144, 146, 206.

68. March madness and marchmadness.com provide similar services in the sports entertainment marketplace. Both derive their value primarily from the NCAA Tournament, although march madness also derives value from the IHSA tournament and IHSA licensees. Marchmadness.com competes directly with the NCAA's NCAA Tournament website, www.finalfour.net,[68] and with the website produced by a partner of an NCAA licensee, CBS, www.cbssportsline.com, although that website also covers other sports.

69. March madness and marchmadness.com seek business from the same consumers, fans of the NCAA Tournament. Both Dirk and Hall stated that the target group for marchmadness.com was fans of the NCAA Tournament, although Dirk was less inclined to admit this and only did so after repeated questioning during cross-examination.

70. SMI solicited advertising for marchmadness.com from the many of the same advertisers as the NCAA. Indeed, SMI, as testified to by Hall and Dirk, approached any advertisers which seemed promising, regardless of whether or not the advertiser had a preexisting relationship with the NCAA (or IHSA).

71. SMI's primary intent in acquiring and developing marchmadness.com was to make a profit.

72. With the exception of the initial acquisition by Netfire of the marchmadness.com domain name from Stein (*see supra*), this Court does not believe that Defendants intended to deceive either prospective advertisers or the public with respect to any affiliation with the NCAA. Rather, it appears that SMI believed, al-beit unreasonably, that by virtue of having acquired the marchmadness.com domain name it had the legal right to use the domain name as it saw fit. And, from the prospective of an entrepreneur, the most profitable use of the domain name was to exploit preexisting good will, specifically that of the NCAA Tournament. Indeed, that is why the domain name was acquired.

73. While actual confusion among consumers has not been demonstrated in this case, there is abundant evidence of actual confusion among advertisers who were solicited by Hall. As noted above, approximately 25% of the advertisers contacted by Hall inquired, *on their own initiative*, as to whether marchmadness.com was affiliated with the NCAA. Indeed, Hall stated that in one case, someone he spoke with expected to be able to advertise on marchmadness.com for free because the corporation was already a corporate sponsor of the NCAA. This testimony from a former employee of SMI evinces many instances of confusion. Another instance of confusion was that of David Smith, the head of an advertising company, who testified in his video deposition that, *after* hearing the sales pitch from Hall, he inquired "Don, you guys have the rights to use this?" Hall responded by assuring him that SMI had the rights to the website.

74. Reviewing the evidence on these seven digits of confusion, this Court concludes that there is a substantial likelihood of confusion between marchmadness.com and march madness. All seven of the digits of confusion point to the existence of a substantial likelihood of confusion.

75. If any of the foregoing Findings of Fact may be more properly deemed a Con-

---

68. *See* Plaintiff's Ex. 60 *and* Transcript vol 2 (testimony of Colin Boatwright) for additional information on finalfour.net.

clusion of Law, it is hereby incorporated by reference into the Conclusions of Law

## II. CONCLUSIONS OF LAW

### A. TRADEMARK INFRINGEMENT

■ 1. "A trademark is a word, name, or symbol that is intended to distinguish one producer's goods from those of other producers." *Sport Supply Group, Inc. v. Columbia Casualty Co.*, 335 F.3d 453, 460 (5th Cir.2003); 15 U.S.C. § 1127. Discussing the function of trademarks and the rationale for their legal protection, Justice Frankfurter, in 1942, stated:

> The protection of trade-marks is the law's recognition of the psychological function of symbols. If it is true that we live by symbols, it is no less true that we purchase goods by them. A trade-mark is a merchandising short-cut which induces a purchaser to select what he wants, or what he has been led to believe he wants. The owner of a mark exploits this human propensity by making every effort to impregnate the atmosphere of the market with the drawing power of a congenial symbol. Whatever the means employed, the aim is the same—to convey through the mark, in the minds of potential customers, the desirability of the commodity upon which it appears. Once this is attained, the trade-mark owner has something of value. If another poaches upon the commercial magnetism of the symbol he has created, the owner can obtain legal redress.

*Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.*, 316 U.S. 203, 205, 62 S.Ct. 1022, 86 L.Ed. 1381 (1942). "Trademark law helps ensure that a trademark can serve this function of distinguishing a producer's goods, because it prohibits other producers from using a similar mark in a way that is 'likely to cause confusion' among consumers *i.e.*, by making consum-

ers wonder which producers created which products." *Sport Supply*, 335 F.3d at 460. Protection of trademarks "lower[s] consumer search costs and encourage[s] higher quality production by discouraging free riders." *Union National Bank of Tx., Laredo, Tx., v. Union National Bank of Tx., Austin, Tx.*, 909 F.2d 839, 844 (5th Cir.1990).

■ 2. "The threshold issue in any action for trademark infringement is whether the word or phrase is initially registerable or protectable." *Zatarains, Inc. v. Oak Grove Smokehouse, Inc.*, 698 F.2d 786, 790 (5th Cir.1983) (citing *Vision Center v. Opticks, Inc.*, 596 F.2d 111, 115 (5th Cir.1979)). Once protectability under the Lanham Act has been established, the second inquiry is whether a likelihood of confusion exists between the marks at issue. *Society of Financial Examiners v. National Ass'n of Certified Fraud Examiners, Inc.*, 41 F.3d 223, 224 (5th Cir.1995); *Pebble Beach*, 155 F.3d at 543 ("The touchstone of infringement is whether the use creates a likelihood of confusion"); *Sun Banks of Florida, Inc. v. Sun Federal Savings and Loan Ass'n*, 651 F.2d 311, 319 (5th Cir.1981) ("When there is no likelihood of confusion, there can be no trademark infringement"); *see also IHSA v. GTE Vantage*, 99 F.3d at 246 ("The issue of likelihood of confusion does not arise, however, until it is determined that the plaintiff has a trademark that the law will protect"). Both the determination of protectability and that of likelihood of confusion are "fact-intensive inquiries [which] cannot be conducted properly without a trial." *Society of Financial Examiners*, 41 F.3d at 224. The requirements for trademark infringement under Texas law are the same as those under the Lanham Act. *Sport Supply*, 335 F.3d at 461; *Elvis Presley Enterprises, Inc. v. Capece*, 141 F.3d 188, 193 (5th Cir.1998).

■ 3. Although registration with the PTO confers certain procedural advantages upon trademark owners, registration is not necessary to bring an infringement action under § 43 of the Lanham Act, codified at 15 U.S.C. § 1125(a). *Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 768, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992) ("it is common ground that § 43(a) protects qualifying unregistered trademarks and that the general principles qualifying a mark for registration under § 2 of the Lanham Act are for the most part applicable in determining whether an unregistered mark is entitled to protection under § 43(a)"); *Union Bank,* 909 F.2d at 842 ("Ownership of trademarks is established by use, not by registration"); McCarthy on Trademarks and Unfair Competition § 27–14 (4th ed.).

4. At the time this case was filed, February 22, 2000, MMAA (and its predecessors in interest) held one registration for the phrase March madness, namely, the service mark originally obtained by Intersport in December 1989 (number 1,571,340). *See supra* table of registered marks.[69] However, this mark was for "[e]ntertainment services, namely, presentation of athletic and entertainment personalities in a panel forum, in class 41." [70]

5. Although the classification of goods and services made by the PTO does "not limit or extend the applicant's or registrant's rights," 15 U.S.C. § 1112, MMAA, in this action, is not relying solely on rights arising from this registered trademark. Instead, MMAA contends that, through its (and its licensees) use of March madness, it has acquired significant common law rights to March madness. Moreover, after this case was filed, MMAA obtained registrations for six additional

March madness trade or service marks from the PTO.

6. These subsequent registrations are prima facie evidence of the existence of a protectable mark. 15 U.S.C. § 1125(a). However, the outcome of this case is unaffected by whether the burden is placed on MMAA or Defendants to establish the validity or genericness of March madness.

■ 7. The protectability of a multiword mark such as March madness is determined by analysis of the entire phrase considered as a whole, not by the protectability of its constituent words. *Ass'n of Co-Operative Members, Inc. v. Farmland Industries, Inc.,* 684 F.2d 1134, 1140 (5th Cir.1982) ("The whole, in trademark law, is often greater than the sum of its parts. Common words in which no one may acquire a trademark because they are descriptive or generic may, when used in combination, become a valid trademark."); *Union Bank,* 909 F.2d at 848 n. 25 ("The commercial impression of a trade-mark is derived from it *as a whole,* not from its elements separated and considered in detail. For this reason it should be considered in its entirety") (quoting *Estate of P.D. Beckwith v. Commissioner of Patents,* 252 U.S. 538, 545, 40 S.Ct. 414, 64 L.Ed. 705 (1920)).

8. To determine whether a mark is protectable, a court must assign the mark into one of five categories, which, arranged in order of increasing distinctiveness, are: (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, or (5) fanciful. *Two Pesos,* 505 U.S. at 768, 112 S.Ct. 2753. "The significance of assigning a word or phrase to one of these categories is that the assignment determines whether or not, or in what circumstances, the word or phrase is eligi-

---

**69.** There are also several registrations for "America's Original March Madness" which predate this suit.

**70.** Plaintiff's Ex. 91.

ble for trademark protection." *Union Bank*, 909 F.2d at 844. "Although these categories are meant to be mutually exclusive, they are spectrum-like and tend to merge imperceptibly from one to another. For this reason, they are difficult to define and, quite frequently, difficult to apply." *Vision Center*, 596 F.2d at 115; *see also Soweco, Inc. v. Shell Oil Co.*, 617 F.2d 1178, 1183 (5th Cir.1980) ("although meant as pigeon-holes, these useful labels are instead central tones in a spectrum").

9. A generic term "refers to an entire class of products (such as 'airplane' or 'computer'), does not distinguish a product at all, and therefore receives no protection under trademark law." *Sport Supply*, 335 F.3d at 461 n. 7; *see also Union Bank*, 909 F.2d at 845 ("A generic term is one which identifies a genus or class of things or services, of which the particular item in question is merely a member."); *Soweco*, 617 F.2d at 1183 ("A word may be generic of some things and not of others: 'ivory' is generic of elephant tusks but arbitrary as applied to soap").

10. A descriptive term "describes some features or characteristics of a product (*i.e.*, 'All Bran' or 'Holiday Inn'), [and] is 'not inherently distinctive.'" *Sport Supply*, 335 F.3d at 461 n. 7; *see also Union Bank*, 909 F.2d at 845 ("A descriptive term is one that 'identifies a characteristic or quality of the article or service.'") A descriptive term does not receive trademark protection unless it has acquired secondary meaning. *Sport Supply*, 335 F.3d at 461 n. 7; *Two Pesos*, 505 U.S. at 769, 112 S.Ct. 2753.

11. "Suggestive, arbitrary, and fanciful marks, by contrast, better distinguish their products and are therefore accorded more protection." *Sport Supply*, 335 F.3d at 461 n. 7. These three types of marks are deemed to be "inherently distinctive" and are, therefore, protectable without requir-

ing a showing of secondary meaning. A suggestive term "merely suggests the features of the product, requiring the purchaser to use imagination, thought, and perception to reach a conclusion as to the nature of the goods." *Id.* (quoting *Lane Capital Management, Inc. v. Lane Capital Management, Inc.*, 192 F.3d 337, 344 (2d Cir.1999)); *see also Union Bank*, 909 F.2d at 845. An arbitrary term "uses 'a common word in an unfamiliar way.'" And, a fanciful term "is 'not a real word at all,' but is invented solely for the purpose of identifying a particular product." *Sport Supply*, 335 F.3d at 461 n. 7.

■ 12. A judicial finding of genericness is fatal to any mark's claim of legal protection, for "[t]he terms 'generic' and 'trademark' are mutually exclusive." *Society of Financial Examiners*, 41 F.3d at 226 (quoting McCARTHY § 1201 (3d ed.)). Even "total confusion" becomes "irrelevant" if the complaining mark is a deemed to be generic. *Society of Financial Examiners*, 41 F.3d at 225. "Genericide" can occur when a protected mark, over time, becomes the shorthand name for an entire genus of products sold under it. McCARTHY § 8.7.3 (4th ed.). Examples of once trademarked terms that have become generic include "thermos," "escalator," "aspirin," and "yo-yo." *Id; see also Union Bank*, 909 F.2d at 846 ("The English language, more than most, is in a constant state of flux. A word which is today fanciful may tomorrow become descriptive or generic"). Although it is possible for a party to recapture a generic term from the public domain, such a feat is rare. *See id.* (discussing the recapture of "Singer" for sewing machines).

■ 13. Classification of a mark into one of these categories is a question of fact. *Union Bank*, 909 F.2d at 846 ("the categorization of a term is properly considered a matter of fact because the appropriate

categorization is not self-evident"); *Lane Capital,* 192 F.3d at 344. In this case, after carefully considering the full record, this Court has found "March madness" to be a descriptive term which has acquired secondary meaning. *See Findings of Fact.* It is therefore protectable as a trademark under the Lanham Act, and Texas law. In so doing, this Court rejects Defendants assertions that March madness has become generic.

14. March Madness is a descriptive term, *see Findings of Fact,* and is, therefore, only protectable upon a strong showing of secondary meaning. The secondary meaning must be shown at the time Defendants allegedly violated 15 U.S.C. § 1125 by developing and then placing on-line their website. *Sugar Busters LLC v. Brennan,* 177 F.3d 258, 269 n. 8 (5th Cir.1999). "Secondary meaning is achieved when 'in the mind of the public, the primary significance of a product feature or term is to identify the source of the product rather than the product itself." *Id.,* at 268 (5th Cir.1999) (quoting *Two Pesos,* 505 U.S. at 766 n. 4, 112 S.Ct. 2753); 15 U.S.C. § 1064(3); *see also Union Bank,* 909 F.2d at 841 n. 3.

15. The primary significance of a term to the relevant public determines which category the term will be placed in. *Lane Management,* 192 F.3d at 344–45. By "relevant public" is meant neither the Court, the party claiming the term, nor the general public. Rather the relevant public is the "prospective purchasers of the product." *Id.,* at 345; *see also* MCCARTHY §§ 12:4, 12:6 (4th ed.). The question, as put by Learned Hand, is "[w]hat do *buyers* understand by the word for whose use the parties are contending?" *Bayer Co. v. United Drug Co.,* 272 F. 505, 509 (S.D.N.Y. 1921) (emphasis added).

16. Survey evidence is the preferred method of determining secondary mean-

ing. *Zatarains,* 698 F.2d at 795 ("survey evidence is the most direct and persuasive way of establishing secondary meaning"); *Sugar Busters,* 177 F.3d at 269. However, in addition to survey evidence, other circumstantial evidence such as "amount and manner of advertising, volume of sales, and length and manner of use" is also considered relevant to a determination of secondary meaning. *Zatarains,* 698 F.2d at 795. Teflon surveys, in, which a respondent is given "a mini-course in the generic versus trademark distinction" and then asked to apply his understanding to a set of terms, are common in trademark cases. MCCARTHY § 12:16 (4th ed.).

17. When deciding how much weight to give to survey data, courts pay particular attention to "the format of the questions and the manner of conducting the survey." *Exxon Corp. v. Tx. Motor Exchange of Houston, Inc.,* 628 F.2d 500, 506 (likelihood of confusion survey); *see also Amstar Corp. v. Domino's Pizza, Inc.,* 615 F.2d 252, 264 (5th Cir.1980) (same). Indeed, in some instances, Courts have entirely discounted survey evidence offered by a party. *Amstar,* 615 F.2d at 263 (the trial court found a survey "about as contrived a survey as I have ever run across"). This Court has examined the format, methodology, universe of respondents, and survey administration carried out by Mantis on behalf of Plaintiff, and concluded that the survey should be given substantial weight as indicative of the primary significance of March madness as a trade name within the context of basketball. *See Findings of Fact.* The Court also noted, and gave additional, albeit less, weight to the other circumstantial evidence offered by Plaintiff in support of a finding of secondary meaning. This includes the evidence of large national TV audiences. After conducting its analysis, the Court found that March madness is a descriptive term which has acquired

secondary meaning in the context of basketball.

18. In finding March madness to be a descriptive term which has acquired secondary meaning, this Court rejects the arguments in favor of genericness made by Defendants. Defendants raise three primary arguments in support of their contention that March madness is generic: (1) the large number of unauthorized third party uses makes the term generic; (2) testimony of Fry and Caito that March madness "transcends" the sport of basketball makes the term generic; and (3) because both IHSA and NCAA are sources for March madness, the term is generic and has been held to be so the Seventh Circuit in *IHSA v. GTE Vantage*. Each of these arguments is considered below.

19. Third party uses outside the scope of basketball are of little, if any, relevance to the analysis of which of the five categories March madness should be assigned to, although such uses are relevant to the likelihood of confusion analysis. *Union Bank*, 909 F.2d at 848. As the Fifth Circuit has stated, in order to determine the appropriate category for a term, "parties may introduce evidence regarding how many other businesses *in the same industry* use the term to describe their product." *Union Bank*, 909 F.2d at 848 (emphasis in original). Evidence of use within the same industry is probative of whether or not a term is generic. Similarly, the Seventh Circuit, in *IHSA v. GTE Vantage*, stated that uses of March madness to promote discount car sales "are too remote to bear significantly" on the question of the underlying trademark rights of March madness. *IHSA v. GTE Vantage*, 99 F.3d at 247. In this case, Defendants have offered only a few isolated instances of the use of March

madness within the basketball entertainment industry by a party other than MMAA (or its predecessors in interest, the NCAA and IHSA). As such, there are few third party uses to speak of. Specifically, there is the book *March Madness: The Kentucky High School Basketball Tournament*, written by Mike Embry and published in 1985 by Icarus Press, in South Bend, Indiana.[71] Testimony at trial indicated that IHSA was not aware of this book at the time it was published, and the book is currently out of print. Moreover, the Commissioner of the Kentucky High School Athletic Association ("KHSAA"), in a declaration, stated that the author of the book had never been an employee of the KHSAA and the KHSSA "did not authorize, sanction, or participate in the writing of the book," and has never distributed it or used it in any promotions.[72] Accordingly, this one-time instance of publication in the mid–1980s is not enough to overcome the other evidence in support of a finding of acquired distinctiveness of the term March madness. The same is true for the more recent publication, *March Madness*, written by Stanley Wagner, and published in 1999 by SterlingHouse Publisher, Inc., although the factual record regarding this book is less developed.[73]

20. Defendants also contend that Plaintiff, specifically Caito and Fry, both admitted, in their depositions, that March madness is generic, and that such statements are judicial admissions binding upon the NCAA, IHSA, and MMAA by virtue of Caito and Fry's status as designated witnesses pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure. Specifically, Defendants contend that statements made by Fry and Caito that March madness "transcends the particular use of

**71.** Defendants' Ex. 88.

**72.** Plaintiff's Ex. 212.

**73.** Defendants Ex. 210.

both the Illinois High School Association and the NCAA and means the seasonal culmination of the sport of basketball" are admissions that the term is generic.[74] However, 30(b)(6) is not the straitjacket Defendants presume it to be. In *A.I. Credit*, the Seventh Circuit recently rejected an attempt similar to that being made by Defendants, instead holding that because the testimony "can be construed" to mean different things, the issue is one for the finder of fact. *A.I. Credit Corp. v. Legion Ins. Co.*, 265 F.3d 630, 637 (7th Cir.2001). The same holds true in this case. Both Fry and Caito testified that, in agreeing with the "transcends" statement in Defense counsel's question, they meant that March madness is a strong enough term that it can be marketed and licensed outside the sport of basketball, and such a view is reasonable. It is an issue for the finder of fact. Moreover, even presuming *arguendo* that Caito and Fry both felt the term was generic, which this Court does not believe, it is the view of the prospective purchasers which controls, not that of the term's licensors.

21. Third, and perhaps most importantly, Defendants argue that March madness is generic because both IHSA and the NCAA claim to be the owners of the term, and thus the term does not refer to a single source. As discussed in the *Findings of Fact*, both IHSA and the NCAA have sought protection for their uses, within the context of basketball, for the term March madness. Their competing claims led to a case wherein IHSA sought to enjoin one of the NCAA's licensees from using March madness. *IHSA v. GTE Vantage*, 99 F.3d 244 (7th Cir.1996). Defendants contend that, on appeal, the Seventh Circuit held the term March madness to be generic. However, a closer examination of the Seventh Circuit's opinion reveals this to not be

the case. Judge Posner, writing for the Seventh Circuit, addressed the question of the scope of IHSA's rights *vis à vis* the NCAA, and held that IHSA's right do not extend to the NCAA Tournament. The Court, in its closing paragraph made this quite clear, stating:

> We do not opine on the scope of the trademark rights that either the IHSA or NCAA has, beyond ruling that IHSA's rights do not extend to the NCAA tournament and to merchandise such as Vantage's game that is sold in connection with the tournament.

*IHSA v. GTE Vantage*, 99 F.3d at 248. In other words, IHSA could not prevent the NCAA from using March madness in the context of the NCAA Tournament and related merchandising. The opinion also contains language regarding dual-use terms, and stating that the categorization of such terms, as "an issue of first impression ... should be resolved against trademark protection, thus assimilating dual-use or multiple-use terms to generic terms." *Id.*, at 247. However, this analysis of dual-use terms is not necessary to support Judge Posner's holding; the holding was simply that IHSA's rights do not extend to the NCAA Tournament.

22. Subsequent to *IHSA v. GTE Vantage*, IHSA and the NCAA formed MMAA to pool their rights to March madness, and thus create a single source for the marks. Assignments and licensing arrangements among holders of trademark rights are common, and are provided for by the Lanham Act. *See* 15 U.S.C. §§ 1060 (assignment of marks), 1055 (use of marks by related companies); 1127 (definition of related companies); *Moore Business Forms, Inc. v. Ryu*, 960 F.2d 486, 489 (5th Cir. 1992) ("A trademark owner may grant a license and remain protected provided

---

74. *See* Transcript Vol. 4 at 130–42 (Caito) *and*　Transcript Vol. 2 at 227–29(Fry).

quality control of the goods and services sold under the trademark by the licensees is maintained").

23. A more interesting question concerns the evolution of the rights in March madness, from first use by IHSA, through dominant use in the national media by the NCAA, to the current situation where use by both inures to the MMAA. As stated by the Fifth Circuit:

> The first one to use a mark is generally held to be the 'senior' user and is entitled to enjoin other 'junior' users from using the mark, or one that is deceptively similar to it, subject to limits imposed by the senior user's market and natural area of expansion.

*Union Bank,* 909 F.2d at 842–43; *see also id.,* at 843 n. 9 (noting the difficulties in senior and junior user analysis). In this case, that first user was IHSA. However, as noted by Judge Posner, "IHSA was not assiduous" in protecting its mark, allowing the mark to be used by a "junior" (*i.e.* later in time) party, the NCAA. *IHSA v. GTE Vantage,* 99 F.3d at 246; *see also Amstar,* 615 F.2d at 265 ("We also note that plaintiff has not been vigilant in protecting its rights in the 'Domino' mark"). Ultimately, the NCAA and IHSA, to address any issues relating to their separate rights in March Madness, pooled their rights into the MMAA. MMAA now properly holds those rights. Defendants assertions to the contrary are without merit.

24. As noted earlier, the content of Defendants' marchmadness.com website solely related to the NCAA Tournament. There was no content relating to high school basketball. As such, it would appear that Defendants website infringed primarily on the underlying rights of the NCAA. However, with the formation of MMAA, there is no need to reach this question.

25. As noted in the *Findings of Fact,* a number of factors are examined in order to determine if a likelihood of confusion exists, including: (1) the type of mark allegedly infringed, (2) the similarity between the two marks, (3) the similarity of the products or services, (4) the identity of the retail outlets and purchasers, (5) the identity of the advertising media used, (6) the defendant's intent, and (7) any evidence of actual confusion. *Pebble Beach Co., v. Tour 18 I Limited,* 155 F.3d 526, 543 (5th Cir.1998). "No single factor is dispositive," nor does a finding of likelihood of confusion require "a positive finding on a majority of these 'digits of confusion.'" *Westchester Media, v. PRL USA Holdings, Inc.,* 214 F.3d 658, 664 (5th Cir. 2000). Moreover, a court is also "free to consider other relevant factors in determining whether a likelihood of confusion exists." *Id.* However, likelihood of confusion does require more than the mere possibility of confusion; it requires "a probability of confusion." *Id.* After examining the evidence, this Court believes a strong likelihood of confusion exists between Marchmadness.com and March madness. *See Finding of Fact.* Fans of the NCAA Tournament who visit the marchmadness.com website are likely to have the impression that the site is, in some way, affiliated with or authorized by the NCAA.

26. Fans seeking to find a website about the NCAA Tournament are likely to suffer confusion when they intuitively type marchmadness.com into their web browsers, and, rather than arriving at an authorized NCAA site, end up at the site owned by Defendants. Once at Defendants' site, users may not visit other sites, thus depriving the NCAA's authorized sites of visitors, and, hence, advertising and sales revenue. Such diversion of traffic is known as initial interest confusion and can support a finding of trademark infringement. *See Elvis Enterprises,* 141 F.3d at

204 ("Initial-interest confusion is beneficial to the [d]efendants because it brings patrons in the door ... Once in the door, the confusion has succeeded because some patrons may stay, despite realizing that the bar has no relationship with [the trademark holder]").

■ 27. SMI's use is not fair use because SMI attempted to commercially use March madness in its trademark sense, as a moniker for the NCAA Tournament, rather than in its descriptive sense as something crazy which occurs in March. *Sugar Busters*, 177 F.3d at 270–71 ("The fair-use defense allows a party to use a term in good faith to describe its goods or services, but only in actions involving descriptive terms and only when the term is used in its descriptive sense rather than in its trademark sense"); *Gallo Winery*, 286 F.3d at 275 (defendant's "use is commercial, and there is no indication that it is a fair use").

28. Moreover, MMAA (and its predecessors in interest) are not barred by the doctrine of laches, as both the NCAA and IHSA sent cease and desist letters to SMI in 1996. *See Findings of Fact; Elvis Enterprises*, 141 F.3d at 205 ("Any acts after receiving a case and desist letter are at the defendant's own risk because it is on notice of the plaintiff's objection to such acts"). There is also no evidence of permission, acquiescence, or abandonment on the part of the NCAA, IHSA or MMAA. *Elvis Enterprises*, 141 F.3d at 206 ("Acquiescence involves the plaintiff's implicit or explicit assurance to the defendant which induce[s] reliance by the defendant ... The period of silence relevant to acquiescence would not include any time after the cease and desist letter was sent because EPE explicitly communicated its objection"); 15 U.S.C. § 1127 (defining abandonment); *Pebble Beach*, 155 F.3d at 543–44 (discussing abandonment and permission).

■ 29. Other arguments raised by Defendants are also without merit, and need not be addressed in great detail. The lack of registrations on the part of IHSA and the NCAA, as noted *supra* does not impact the existence of trade mark rights, except for those procedural advantages such as incontestability which are available only to registered marks. No trademark rights arise from the mere acquisition of a domain name when that name is confusingly similar to an existing trademark. To acquire ibm.com and then claim, by virtue of such acquisition, that one has an independent right to use the name IBM to sell computers is wishful thinking which will not stand in a court of law. This is what Defendants have attempted to do with marchmadness.com

## B. CYBERSQUATTING

30. The Anti–Cybersquatting Consumer Protection Act ("ACPA") provides a right of action for the owner of a trademark against a person who:

> (i) has a bad faith intent to profit from that mark; and (ii) registers, traffics in, or uses a domain name that ... in the case of a mark that is distinctive at the time of registration of the domain name is identical or confusingly similar to that mark.

15 U.S.C. § 1125(d)(1)(A); *see generally Gallo Winery*, 286 F.3d at 273–278. In this case, it is undisputed that Defendants (specifically, Netfire acting on behalf of SMI) acquired the registration of marchmadness.com on February 6, 1996. *See Findings of Fact*. The domain name marchmadness.com is identical to March madness. *Gallo Winery*, 286 F.3d at 272.

31. This Court finds that March madness was a distinctive mark on February 6, 1996. In the absence of survey data for precisely that period, this Court looks to

other available evidence in the record. By February 1996, in the context of high school basketball tournaments, IHSA already had been using the term for over 50 years. In addition, IHSA owned the Intersport registration. Moreover, the NCAA (through a licensee, CBS) had already been using the term for almost 15 years in its national broadcasts of the NCAA Tournament, and had been licensing it since 1988. Accordingly, this Court finds that March madness was a descriptive term which had acquired secondary meaning by February 6, 1996.

32. In order to determine whether a person who is an alleged cybersquatter had a "bad faith intent to profit," the ACPA provides that "a court may consider" includes:

> (I) the trademark or other intellectual property rights of the person, if any, in the domain name; (II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person; (III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services; (IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name; (V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site; (VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used or having an intent to use, the domain name in the bona fide offering of goods or services, or the

person's prior conduct indicating a pattern of such conduct; (VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct; (VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names ... without regard to the goods or services of the parties; and (IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c)(1) of this section.

15 U.S.C. § 1125(d)(1)(B)(i).

33. The ACPA also provides a fair use defense which provides that "[b]ad faith intent ... shall not be found in any case in which the court determines that the person believed and had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful." 15 U.S.C. § 1125(d)(1)(B)(ii). SMI's use of marchmadness.com is not fair use under the ACPA, for despite whatever Defendants subjective beliefs may have been, they certainly did not have "reasonable grounds" to believe that their use of marchmadness.com was a fair use. It was a commercial use seeking to exploit the goodwill at the core of the NCAA's (and now MMAA's) rights to March madness, namely, the NCAA Tournament. Having disposed of the ACPA's fair use defense, the Court now turns to the factors relating to bad faith intent. *Cf. Gallo Winery*, 286 F.3d at 275–278.

34. SMI's had no intellectual property in march madness; it had only its registration of the domain name of marchmadness.com (factor I). Marchmadness.com does not contain the name of SMI or any of the other Defendants (factor II). The Defendants did not make any prior use of marchmadness.com in connection with the bona fide offer of goods or services (factor III). The Defendants did not make any bona fide noncommercial or fair use of marchmadness.com (factor IV). Defendants, as borne out by the testimony of Dirk and the deposition of Hall, sought to divert traffic from the NCAA (and its licensees') own web sites, such as finalfour.net and cbssportsline.com (factor V). This Court finds Dirk's denials and evasiveness on the issue of diversion of traffic to be entirely without credibility. Defendants did not offer to sell marchmadness.com to MMAA (or its predecessors in interest) without using it, instead they intended to develop a full-featured site about the NCAA Tournament (factor VI). There is no evidence that Jones or SMI provided false information to NSI when registering the domain name, however, there is evidence that Jones made misrepresentations to Stein when acquiring the domain name from him (factor VII). Although Jones has registered many domain names that are identical or confusingly similar to distinctive marks, there is no evidence in the record that SMI has done so (factor VIII). Lastly, this Court has not found that march madness is a distinctive and famous mark (factor IX).

35. Reviewing the results, it is apparent that the majority of factors, at least seven with respect to Jones, and five with respect to SMI bode in favor of finding bad faith intent. Considering the above factors, and the other evidence in this case, this Court holds that SMI, Netfire and Jones acted with bad faith intent, and that their use of the marchmadness.com was in violation of the ACPA. While the ACPA applies to "all domain names" irrespective of when they were registered, damages are not available for any violations occurring before November 29, 1999. 15 U.S.C.A. § 1117; Pub.L. 106–113 § 3010; *Gallo Winery*, 286 F.3d at 277. The evidence in this case shows that, by the end of July 1999, the marchmadness.com website had been placed on hold by NSI where it was until April 4, 2000 when it was placed in the registry of this Court. Accordingly, there is no evidence of any "use" of marchmadness.com by Defendants on or after November 29, 1999. *Cf. Gallo Winery*, 286 F.3d at 277 ("although Spider Webs registered the domain name before the effective date of the ACPA, because they *used* the domain name after this date, they can be held liable for statutory damages for this use").

36. Despite the unavailability of damages, this court may provide redress for a violation of the ACPA by ordering "the forfeiture or cancellation ... or the transfer of the domain name to the owner of the mark." 15 U.S.C. § 1125(d)(1)(C).

C. CIVIL CONSPIRACY

37. Plaintiff contends that Defendants were engaged in a conspiracy to unlawfully register and use the domain name marchmadness.com. Under Texas law, a civil conspiracy requires: "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of minds on the object or course of action; (4) one or more unlawful, overt acts; and (5) damages as the proximate result." *Massey v. Armco Steel Co.*, 652 S.W.2d 932, 934 (Tex.1983). "The 'gist of a civil conspiracy' is the injury the conspirators intend to cause." *Firestone Steel Products Co. v. Barajas*, 927 S.W.2d 608, 614 (Tex.1996). Moreover, "[c]ivil conspiracy requires specific

intent ... the parties must be aware of the harm or the wrongful conduct at the beginning of the combination or agreement....One cannot agree, expressly or tacitly, to commit a wrong about which he has no knowledge." *Id.*

38. Plaintiff has failed to prove, by a preponderance of the evidence, the existence of a civil conspiracy in this case. MMAA's Amended Complaint alleges that: "Netfire, through Jones, and SMI acted together to defraud Stein and tortiously interfere with NCAA's prospective business relationship with Stein and/or IGS, a relationship NCAA had a reasonably [sic] probability of entering into." [75] And, further that: "There occurred a meeting of the minds on the object and course of actions by and between Netfire and SMI, their employees and representatives acting on their behalf on or before February 1996." [76] The conspiracy claim, therefore, focuses on the period prior to the acquisition of the marchmadness.com domain name from Stein. While the evidence shows that there was a meeting of the minds to acquire the domain name, *i.e.* Dirk's instructions to Jones in late 1995 or early 1996, the preponderance of the evidence does not indicate a specific intent to harm Stein. Rather the shared intent was to procure marchmadness.com by registering it directly from NSI. Both Dirk and Jones testified that Dirk did not even know about Jones' purchase from Stein until 2001. While both Dirk and Jones were not highly credible overall, this Court does believe that Jones acquired the domain name from Stein without telling Dirk. Thus, as there was no meeting of the minds with respect to Stein, it follows that there was no meeting of the minds to defraud Stein or to interfere with a proposed contractual relationship between the NCAA and Stein. There was no conspiracy to defraud Stein or any other party.

**D. REMEDIES FOR TRADEMARK INFRINGEMENT AND CYBERSQUATTING**

39. The Lanham Act allows a range of remedies for trademark infringement and false representation. 15 U.S.C. § 1117. The act states that:

> [w]hen a violation of the registrant of a mark registered in the Patent and Trademark Office, a violation under section 1125(a) or (d) of this title ... shall have been established in any civil action arising under this chapter, the plaintiff shall be entitled, subject to the provisions of sections 1111 and 1114 of this title, and subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by plaintiff, and (3) the costs of the action. The court shall assess such profits and damages or cause the same to be assessed under its direction. In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed. In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount. If the court shall find that the amount of the recovery based on profits is either is either inadequate of excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case. Such sum in either of the above circumstances shall constitute compensation and not a penalty. The court in exceptional cases may

---

**75.** Amended Complaint (filed September 10, 2001) ¶ 23.

**76.** *Id.,* ¶ 24.

award reasonable attorney fees to the prevailing party.

15 U.S.C. § 1117(a). This Court hereby holds that Defendants have violated 15 U.S.C. § 1125. Specifically, SMI, Netfire and Jones have violated §§ 1125(a) and (d) by committing trademark infringement of the term March madness. In addition, Netfire and Jones has made false representations in violation of 15 U.S.C. § 1125(a).

40. On the question of profits, Plaintiff has not shown any evidence of Defendants' sales from Marchmadness.com. The only evidence was for one sale for $6,500 of web advertising, and that sale ultimately was not consummated. The site was put on hold by NSI before Defendants were able to complete any sales. Thus Defendants' sales, and hence profits, are zero.

41. Plaintiff has also not offered meaningful evidence to support a specific award of damages. Plaintiff appears to have two different damage theories, neither of which is persuasive. First, Boatwright testified and submitted a report regarding the financial position of www.finalfour.net.[77] However, Boatwright's testimony is of little use to this Court, both because Plaintiff has not articulated its theory of how finalfour.net was damaged by Defendants' registration and use of marchmadness.com, and because the report Boatwright drafted states very clearly that its financial numbers are very rough estimates, based on scant documentation, conjured up well after the fact.[78] As such, although Boatwright was a credible witness, this Court gives very little weight to his report. Second, Bearby testified that the NCAA (and MMAA) have spent over one million dollars prosecuting this case. However, *no documentary evidence substantiating this sum,* and dividing it into its component portions, has been offered. The argument appears to be that, were it not for Defendants, the NCAA would have purchased marchmadness.com from Stein for a minimal sum, and, therefore, that all expenses the NCAA has incurred in this case are damages. However, such a supposition is mere conjecture. Unsupported by documentary evidence detailing the distribution of the requested sums, it is an insufficient basis for a damage award. Moreover, much of any calculation of damages, in the absence of sales, would serve as another route to a recovery of fees. Thus, this Court concludes that Plaintiff has failed to demonstrate any actual damages.

42. Plaintiff is awarded costs of this action.

43. There is no clear formula for determining if a case is exceptional. Rather, the district court is to "consider all the facts and circumstances." *Id.,* at 527. "An exceptional case is one where the violative acts can be characterized as malicious, fraudulent, deliberate, or willful." *Pebble Beach,* 155 F.3d at 555 (quoting *Seven–Up Co. v. Coca–Cola Co.,* 86 F.3d 1379, 1390 (5th Cir.1996)). Plaintiff, as the prevailing party, "must demonstrate the exceptional nature of the case by clear and convincing evidence." *Procter & Gamble Co. v. Amway Corp.,* 280 F.3d 519, 526 (5th Cir.2002). "A district court normally should not find a case exceptional where the party presents what it in good faith believes may be a legitimate defense." *Pebble Beach,* 155 F.3d at 556 (quoting

---

77. Plaintiff's Ex. 60.

78. *Id.,* at 4 ("finding exact revenue and expense figures for the www.finalfour.net ... was extremely difficult" because (1) revenue relating to finalfour.net was not separately recorded, (2) expenses were not tracked by web site, and (3) the relationship with the NCAA provided for $750,000 of expenses so there was no incentive to account for anything beyond that").

*CJC Holdings Inc. v. Wright & Lato, Inc.,* 979 F.2d 60, 65–66 (5th Cir.1992)). Moreover, "lack of damages is an important factor in determining whether a case is exceptional." *Id.,* at 556. If a fee award is made, the district court should award fees only for work that is shown to have been on Lanham Act claims. *Procter & Gamble,* 280 F.3d at 527 (fees only for Lanham Act claims unless the work is "so intertwined that it is *impossible to differentiate*" between work done on Lanham and non-Lanham claims).

44. Whether this case is an "exceptional" one for purposes of § 1117 is a close question. On the one hand, SMI, with the active assistance of Netfire and Jones, has certainly engaged in willful exploitation of the good will built up over many years. It is precisely such good will which makes march madness such a valuable term. However, on the other hand, the bundle of trademark rights in march madness held by the NCAA (now MMAA) was not something that was readily apparent. The NCAA had not registered the March madness mark. Moreover, within months of acquiring the marchmadness.com domain name from Stein in early 1996, SMI received cease and desist letters from *two* different parties-IHSA and the NCAA, which at the time were engaged in litigation in the *IHSA v. GTE Vantage.* The subsequently issued holding from the Seventh Circuit leaves little room for doubt that IHSA's rights do not extend to the NCAA Tournament. However, Judge Posner's opinion also states that the issue of dual-use trademarks is one of first impression. Given this uncertainty about the rights of IHSA and the NCAA, it is foreseeable, although not reasonable, that an entrepreneur would attempt to profit from the unsettled trademark situation by acquiring the domain name marchmadness.com and attempting to profit from the NCAA Tournament. In addition, Plaintiff has not established any of damages, nor shown any loss of sales. Taking these various factors into account, and keeping in mind that Plaintiff is required to establish the "exceptional" nature of the case by clear and convincing evidence, this Court holds that this case is not exceptional for purposes of 15 U.S.C. § 1117. Accordingly, each party shall bear its own fees.

45. Immediate transfer of the domain name from the registry of this Court is proper for the violation of §§ 1125(d), as well as, 1125(a).

46. If any of the foregoing Conclusions of Law may be more properly deemed a Finding of Fact, it is hereby incorporated by reference into the Findings of Fact

### III. CONCLUSION

In the above Findings of Fact and Conclusions of Law, Defendants were found to have committed trademark infringement in violation of the Lanham Act and Texas law, and committed cybersquatting in violation of the Lanham Act.

Defendants are hereby **ORDERED** (1) to pay costs of this action, and (2) to cease commercial use of the term March madness, or any terms which are confusingly similar or likely to create a likelihood of confusion with March madness.

The Clerk of the Court is hereby **ORDERED** to immediately transfer the certificate of the domain name marchmadness.com to Plaintiff.

It is so **ORDERED.**